Docket No. 85453–Agenda 4–January 2000.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JACQUELINE ANNETTE WILLIAMS, Appellant.

Opinion filed October 12, 2000.

JUSTICE McMORROW delivered the opinion of the court:

On November 16, 1995, Debra Evans was fatally shot and stabbed in the Addison apartment where she lived with James Edwards and her children, Samantha, Joshua, and Jordan. Debra was nine months pregnant, and the baby she was carrying, Elijah Evans, was cut from her womb. Samantha was killed in the apartment with her mother. Joshua and Elijah were taken from the apartment, and Jordan was left alone in the apartment with his dead mother and sister. The day after Debra’s and Samantha’s murders, police found Joshua’s dead body in an alley in Maywood. When police arrested defendant, Jacqueline Annette Williams, on November 17, she was holding Elijah, who was still alive. In connection with the murders and kidnappings of the members of the Evans family, defendant, her cousin Laverne Ward, and her boyfriend Fedell Caffey were jointly indicted on several counts of first degree murder and aggravated kidnapping. They were tried separately.

Following a jury trial in the circuit court of Du Page County, defendant was convicted of the first degree murders of Debra, Samantha, and Joshua Evans. She was also convicted of the aggravated kidnappings of Joshua and Elijah Evans. The same jury found defendant eligible for the death penalty and found no mitigating factors sufficient to preclude the imposition of the death penalty. The circuit court sentenced defendant to death for the first degree murders of Debra, Samantha, and Joshua Evans. At a separate sentencing proceeding, the circuit court sentenced defendant to 15 years’ imprisonment for the aggravated kidnapping of Joshua Evans and imposed a consecutive 15-year sentence for the aggravated kidnapping of Elijah Evans.

Defendant directly appeals her murder convictions and death sentence to this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603. Her death sentence has been stayed pending our review. 134 Ill. 2d R. 609(a).

BACKGROUND

At defendant’s trial, James Edwards testified that in November 1995, he was living with Debra and her three children in a two-bedroom apartment in Addison, Illinois. Samantha was 10 years old, Joshua was 7 years old, and Jordan was almost 2 years old. Debra was nine months pregnant and was scheduled to enter the hospital on Sunday, November 19, to have labor induced.

At about 5:30 p.m. on November 16, 1995, Edwards left for his job. When he returned, after leaving work at 2:30 a.m., Jordan met him in the kitchen. Jordan was alive. Edwards found Debra lying on the living room floor between a coffee table and a love seat. She was unresponsive, and Edwards observed a large wound to her stomach. Samantha was lying on the floor in the children’s bedroom. Her neck had been slashed. Joshua was missing. Edwards called 911.

Edwards further testified that several items were missing from the apartment, including a Grambling State University Tigers jacket and a pair of poultry shears. In addition, on the bed that he and Debra shared, there was an Ace bandage that Edwards had never seen before.

Patrice Scott testified that, shortly after midnight on November 17, 1995, defendant, who was a friend of hers, came to the Villa Park apartment Scott shared with Dwight Pruitt and Scott’s three daughters. Joshua was with defendant, and defendant had blood on her sweater. Joshua was wearing a coat and boots but no socks or pants.

According to Scott, defendant asked if Joshua could spend the night at Scott’s apartment because his mother had been shot “out west” during a drug deal, and defendant was going to visit her in the hospital. Defendant also told Scott that she, defendant, had given birth and would bring the new baby with her when she came to retrieve Joshua in the morning.

After defendant left, Scott asked Joshua what his name was. He told her his name and said he needed to use the bathroom. Joshua used the bathroom, and Scott put him to bed on her living room couch. During the night, Scott heard Joshua whimpering and crying in his sleep. Around 5 a.m., Scott arose to feed her newborn, Alexis. Joshua was still whimpering and crying in his sleep. When he awakened around 6 or 7 a.m., he was crying.

Scott testified that she asked Joshua if he was worried about his mother and told him that his mother would be okay. Joshua replied, “No, no, she’s not,” and said that his mother and sister were dead. He explained that four burglars had come through the window and cut his mother and sister. He said that his little brother had been left in the apartment and asked Scott to get Jordan. Joshua told Scott that he had been hiding in the apartment and that, when the burglars left, he ran out after defendant, who brought him to Scott’s apartment. Joshua repeated this story several times.

Scott asked Joshua if he knew who the burglars were. Joshua identified the burglars as Annette, Fedell, Vern, and “Boo-Boo.” According to Scott, defendant is usually called Annette, and defendant has a relative named Bo Wilson. Scott admitted that she did not initially tell police that Joshua had named Fedell and “Boo-Boo” as two of the burglars. She testified that she was afraid of Fedell.

Joshua continued crying after he told Scott what had happened to his family. Scott’s daughters entered the living room and one of them read Joshua a book. Joshua listened to her read, but his emotional state did not change significantly. When Scott’s daughters left for school, Joshua told Scott to chain the door because the burglars might return.

Scott further testified that, around 9 a.m., defendant returned to the Villa Park apartment. Scott informed her that there was a discrepancy between what defendant said had happened to Joshua’s mother and what Joshua said had happened. Scott also told defendant that Joshua had named her, Vern, and Fedell as the “burglars” who had entered his apartment. Defendant became angry at Joshua, cursed at him, and accused him of lying. In response, Joshua asserted repeatedly, “No, no, that’s what happened.”

According to Scott, defendant then told Joshua that his mother had left him some medicine. Joshua replied, “What medicine, I don’t take any medication.” Defendant brought him into the kitchen and gave him something, after which he gagged and vomited. Scott again asked defendant about what Joshua had told her that morning. Defendant said that Joshua talked too much and that Caffey had told her to take him south to the “projects.”

Scott testified that she then agreed to go to defendant’s house so that defendant could give Scott some baby outfits for Alexis. Defendant drove Scott, Alexis, and Joshua in a gray four-door car to her Schaumburg townhouse. At the townhouse, defendant first brought Scott to a bedroom. Caffey and a white baby boy with blond hair and tape on his stomach were on the bed in the bedroom. Defendant then asked Scott to bring Joshua to the laundry room in the townhouse.

Scott testified that Caffey and an unidentified man were already in the laundry room. Scott denied that this man was Ward or Bo Wilson and denied that Wilson had threatened to kill her. After the unidentified man left, defendant told Caffey, “[Joshua’s] got a big mouth. He knows – he knows our names. He said my name, your name and Vern’s name.” Caffey asked defendant why she had brought Scott to the house and why she had not taken Joshua “out south” as he had instructed.

Defendant told Joshua to sit on the day bed in the laundry room and picked up a rope from the floor of the laundry room. She wrapped it around Joshua’s neck, and she and Caffey began strangling Joshua with the rope. Joshua and Scott screamed, Scott pushed defendant, and defendant dropped the rope.

Defendant then left the laundry room and returned holding a knife behind her back. According to Scott, Caffey did not instruct defendant to get the knife. When Scott saw the knife, she screamed and asked Caffey and defendant to take her home and to free Joshua. Defendant threw the knife on the bed. Caffey instructed defendant to take Scott home and informed Scott that, if she told anyone what had happened, he would kill her and her whole family. Scott grabbed Alexis and sat in the front seat of the gray car, which was parked in the garage of the townhouse. Defendant instructed Joshua to sit in the back seat, which he did. Scott looked into the back seat and saw Caffey stabbing Joshua as defendant appeared to be holding Joshua’s arm. Scott felt Joshua kick the seat and heard him gagging.

Defendant then moved to the driver’s seat of the car, and Caffey told her, “You know where to go.” Joshua was whimpering in the back seat, and Scott was afraid for her life and her baby’s life. They drove to Maywood, where defendant and Caffey took Joshua from the car and helped him walk to the back of a building. Defendant and Caffey returned without Joshua. Defendant left Caffey in Maywood and drove Scott to her apartment in Villa Park.

When Scott and defendant arrived at Scott’s apartment, defendant asked Scott for cleaning products to remove vomit from her car. Scott gave her some cleaning supplies, and defendant drove away.

Pruitt’s testimony about the events in Villa Park essentially mirrored Scott’s. He added that he was watching the midday news around 11 a.m. on November 17 when he saw a television news story about the homicides in Addison. He attempted to call the police but could not find a working telephone until after defendant left Scott at the Villa Park apartment, around 12 p.m. After the police arrived, Pruitt and Scott accompanied them to Maywood, and Scott showed police the location where defendant and Caffey had left Joshua.

Pruitt admitted that, at the time of trial, he was serving a prison sentence for a weapons charge. He also testified that he was a gang member and had previous convictions for armed robbery and unlawful possession of a controlled substance.

Defendant’s sister, Tina Martin, testified that, at 3:30 a.m. on November 17, 1995, she received a call from defendant. Defendant stated that she had just given birth and was at a friend’s house. Martin and her mother went to the friend’s house, where they saw defendant, Caffey, and a baby with light coloring.

Members of several different police departments and the Cook and Du Page County state’s attorneys’ offices testified to the circumstances of defendant’s arrest and her statements to them. They testified that, during the afternoon of November 17, Joshua’s partially clothed body was found in an alley in Maywood. That night, police arrested defendant and Caffey at defendant’s Schaumburg townhouse. At the time of their arrest, defendant was carrying Elijah in an infant carrier, and Caffey was wearing the Grambling Tigers jacket taken from the Addison apartment. Police examined Elijah, who was alive, and observed a bloody piece of gauze taped over his navel.

In her initial conversations with police and prosecutors, defendant minimized her role in the murders and kidnappings. For example, during some conversations, she stated that Elijah was her son, and she had given birth at a friend’s house on November 16. Defendant also stated that Caffey was the baby’s father and that the baby’s name was Fedell Caffey, Jr. In other conversations, defendant told police that Caffey and Ward went to the Addison apartment to speak to Debra about the unborn baby and to teach Debra a lesson. Defendant knew there would be “trouble” when they went to the apartment. At Caffey and Ward’s request, defendant met them in the apartment building parking lot at about 10 p.m. on November 16. Caffey exited the building and handed a newborn baby to defendant.

Similarly, defendant attributed much of the responsibility for Joshua’s kidnapping and murder to Scott and Caffey. For example, she told police that Scott gave Joshua Visine and soda pop to drink. Defendant also said that Caffey and Scott wanted her to leave Joshua in the “projects,” but she could not, so she brought him to the Schaumburg townhouse. According to defendant, Caffey was angry that she brought Joshua to the townhouse and asked her to get a knife, which she did. Caffey then instructed defendant and Scott to pull on the ends of a cord wrapped around Joshua’s neck. Caffey told defendant to drive to Maywood and stabbed Joshua during the car ride. Defendant further stated that, after they left Joshua in an alley in Maywood, Scott threw a sheet in which Joshua had been wrapped out of the car window as they drove by the Baldwin piano factory.

In a written statement defendant signed on November 18, however, defendant admitted to a greater role in the murders and kidnappings of the members of the Evans family. She stated that she and Caffey had been dating for two years. Throughout their relationship, defendant and Caffey had attempted to conceive a child. Caffey wanted a baby boy with light skin so that the baby would resemble him. Defendant had become pregnant, but one pregnancy had ended in an abortion and another had ended with a miscarriage.

According to defendant’s statement, Ward was upset with Debra during the four months that preceded the murders. On November 16, 1995, Ward, Caffey, and defendant drove to Debra’s apartment in the gray Sable because Ward wanted to talk to Debra about their son Jordan. Debra was pregnant and planned to deliver her baby on Monday. Debra had chosen to name the baby Elijah.

Defendant further stated that she, Caffey, and Ward arrived at the Evans apartment at about 9 p.m. Debra let them into the building and apartment. Debra sat on a small couch, and she and defendant had a conversation about their children. Subsequently, while defendant was in the bathroom, she heard a loud ringing noise. She exited the bathroom and saw Debra lying on her back. Debra’s eyes were blinking rapidly, and bubbles were coming from her mouth. Caffey was holding a small silver automatic gun. Ward was standing beside Debra and appeared to be stabbing her in the neck.

Caffey then made a cut “crossways” on Debra’s abdomen with the poultry shears. As he cut, defendant could see the head of a baby. She and Caffey wanted the baby because it was a boy. Caffey pulled the baby from Debra and cut the umbilical cord while defendant stood next to him. Caffey did not want the baby at that point because he thought he had killed the baby, but defendant still wanted the baby. She blew into the baby’s nose and mouth, and he began breathing.

Defendant further stated that, as she dressed the baby in a sleeper, Caffey and Ward went into the children’s bedroom. Joshua ran from the bedroom crying that Caffey and Ward were hurting his sister. Defendant covered Debra with a blanket, but when Joshua saw his mother, he vomited and ran to the bathroom.

Defendant began to leave the apartment with the baby. Joshua grabbed her legs and said that he did not want to stay there because Caffey and Ward were bad. Defendant and Joshua exited the apartment through the back entrance. Caffey and Ward joined them in the car and they all drove to a location on Roosevelt Road, where Ward exited the car. Defendant and Caffey then drove to Scott’s, where they left Joshua. Defendant lied and told Scott that Joshua’s mother had been shot at a “drug spot.”

Defendant stated that she and Caffey then drove to the house of a friend, where they placed a bandage on the baby’s navel. Defendant and Caffey spent the night at the Schaumburg townhouse, where they washed some of the baby’s blood from the coat Caffey had stolen from the Addison apartment.

On Friday morning, defendant returned to Scott’s apartment and learned that Joshua had told Scott about the murders. Defendant knew at that point that they “were in deep trouble.” She took Joshua to the Schaumburg townhouse. Scott came with them because she wanted to see defendant’s baby.

According to defendant’s written statement, Caffey and Ward were at the townhouse. They were all afraid that Joshua would identify them. Caffey told defendant to tie a scarf around Joshua’s mouth, which she did. Ward left the townhouse at that point. Defendant asked Joshua to sit on the bed and tried to poison him by having him swallow “antiseptic.” Caffey asked defendant to get a knife. Defendant did so and gave Caffey the knife. Joshua was screaming and frightened. Scott was also frightened because Caffey was threatening her.

Defendant further stated that they put Joshua in the car on the floor behind the driver’s seat. Defendant sat in the driver’s seat, and Caffey sat in the back seat. Caffey wrapped a cord around Joshua’s neck several times and ordered defendant and Scott to pull on the ends of the cord. Joshua was screaming, crying, and moaning. Defendant and Scott dropped the cord, and Caffey began stabbing Joshua. Defendant drove to Maywood, where she pulled into an alley. She removed the sheet that was wrapped around Joshua and left him in the alley. Defendant dumped the sheet at a piano company and drove Scott to her apartment. They killed Joshua because he knew who committed the murders.

In addition to evidence of defendant’s statements to police, the State presented police testimony describing the scene of Debra’s and Samantha’s murders. On the sidewalk in front of the apartment building, police found the poultry shears described by Edwards and by defendant in her written statement. There was blood on the shears, and one of the handles was broken. The windows and doors of the apartment showed no signs of forced entry. There was blood spattered in the living room, hallway, and bathroom of the apartment. Police found an emissions test notice addressed to Debra Evans on a hutch in the living room. The State’s fingerprint expert opined that a fingerprint on the emissions test notice matched defendant’s. In the master bedroom, police discovered an Ace bandage soaked in blood next to a bloodstain on the bed.

In the dishwasher in defendant’s Schaumburg townhouse, police found the knife defendant had identified in her written statement as the weapon used to kill Joshua. In a garbage bag in the garage, police found a white coaxial cable. There was a bed and scarf in the laundry area. There was what appeared to be a pool of blood on the floor of the back seat of the gray car in the garage.

With respect to Joshua’s kidnapping and murder, police recovered an empty brown iodine bottle from the kitchen garbage in Scott’s apartment. On November 18, police discovered a bloodstained bed sheet near the Baldwin Piano Company in Bellwood, seven blocks from the alley where defendant left Joshua’s body. Police found a matching sheet and pillowcase in defendant’s townhouse.

According to the State’s serology expert, the samples from the following items tested positive for human blood: the poultry shears, the bathroom vanity in the Addison apartment, the Ace bandage, the emissions test notice, the Grambling Tigers jacket, the bed sheet found by the piano company, and the carpet from the gray Sable. In addition, there was saliva on the scarf found in defendant’s townhouse, although it could not be determined whether the saliva was human. The State’s DNA experts opined that blood on the white cord from defendant’s garage belonged to Joshua; blood from the Addison apartment vanity belonged to Elijah; blood on the Grambling Tigers jacket belonged to both Elijah and Jordan; blood on the poultry shears belonged to Samantha; blood on the carpet of the gray Sable belonged to Joshua; and blood on the sheet recovered near the piano company belonged to Joshua. In addition, one of the State’s DNA experts testified that in his opinion Ward was the father of both Elijah and Jordan.

Dr. Shaku Teas testified concerning the autopsies she performed on Debra’s and Samantha’s bodies. Samantha had seven stab and incised wounds on her neck and some incised wounds to her left arm. Dr. Teas explained that, generally, a stab wound is deeper than it is long and an incised wound is longer than it is deep. According to Dr. Teas, the cause of Samantha’s death was multiple stab wounds.

With respect to Debra’s autopsy, Dr. Teas testified that a bullet had entered the back of her head and traveled through the right side of her brain to the area behind her forehead. In addition, Debra had four incised wounds to her neck. There was a 13-inch gaping wound from one side to the other of Debra’s abdomen. Her uterus had been sliced open. The placenta and umbilical cord, which had been cut with a sharp instrument, remained in the uterus, but there was no fetus. Some intestines near the uterus had also been cut. Dr. Teas testified that the temporal order of Debra’s wounds could not be determined from the autopsy alone. With respect to the ability of a fetus to survive when its mother dies, Dr. Teas testified that a fetus can survive as long as the mother’s heart is beating. After the mother’s heart stops, however, the fetus can survive for only three to five minutes. In Dr. Teas’ opinion, the main cause of Debra’s death was the gunshot wound, and the multiple stab and incised wounds were contributing causes. Dr. Teas further opined that all of the stab and incised wounds to Samantha and Debra could have been caused by the poultry shears.

Dr. Christopher Olson, Debra’s obstetrician and gynecologist, testified that, when a Caesarean is performed in an appropriate medical manner, three persons are required to deliver a child. If there were no concern for the well-being of the mother and child, fewer persons would be needed. Dr. Olson testified, however, that more than two hands are needed to deliver a baby by Caesarean, particularly if a horizontal incision, such as the one on Debra’s abdomen, is made. Dr. Olson further testified that the incision used to remove the baby from Debra’s uterus was at the back of the uterus. Therefore, the uterus must have been pulled to the side or lifted out of the abdomen to make this cut. According to Dr. Olson, it was unlikely that this could have been accomplished by one person.

Dr. Olson also stated that, for a fetus to survive, it would have to be removed from a nonbreathing mother within two to three minutes. In Dr. Olson’s opinion, Debra’s heart was beating when the baby was removed from her body because the baby survived and because the blood spatters around her body suggested a certain amount of blood pressure.

Dr. Joseph Cogan testified that he performed an autopsy on Joshua. Dr. Cogan stated that Joshua had injuries, such as ligature marks, that indicated strangulation. The marks appeared to be from some sort of cord wrapped around his neck two times. There were several stab wounds to Joshua’s neck. Joshua had no defensive wounds. Dr. Cogan also found evidence of aspiration, that is, evidence that Joshua had inhaled his own vomit.

Dr. Cogan further testified that the stab wounds occurred while Joshua was still alive. The strangulation preceded the stab wounds, and the aspiration occurred after he was stabbed. Dr. Cogan opined that, although he did not analyze Joshua’s stomach contents, the unusual damage to the tissue of Joshua’s lungs from the aspirated stomach contents was consistent with the ingestion of iodine. Dr. Cogan also testified that the ligature marks were consistent with the white cord found in defendant’s garage, and the stab wounds were consistent with the butcher knife found in defendant’s dishwasher. Dr. Cogan testified that Joshua would not have died instantaneously from his injuries but would not have lived for more than 30 minutes. In Dr. Cogan’s opinion, Joshua died from multiple injuries: the strangulation, the stab wounds, and the aspiration of the stomach contents.

In addition to this testimony describing the circumstances of the murders and kidnappings of members of the Evans family, the State presented evidence concerning defendant’s and her codefendant’s activities in the months preceding the murders and evidence of their relationships with the Evans family. Edwards testified that he had been living with Debra since 1989. Between 1989 and 1995, Edwards and Debra separated several times. During these separations, another defendant, Ward, lived with Debra and fathered Jordan and Elijah. Edwards stated that, several months prior to the murders, Debra had decided to name the baby she was carrying Elijah. During the last few weeks before the murders, Ward telephoned the Evans apartment several times, and Edwards overheard Debra arguing with Ward.

Edwards further testified that one week before the murders defendant came to the Evans apartment unexpectedly. Defendant and Edwards had a short conversation, during which defendant asked Edwards what time he went to work and how he traveled to work. Edwards told her that he worked from about 6 p.m. to 2:30 a.m.

Scott testified that, in the fall of 1995, defendant asked her if Pruitt knew where she could get a gun. Pruitt testified that defendant had asked him on several occasions to obtain a gun for her in the summer of 1995. Caffey was with her the last time.

Defendant’s cousin John Pettaway testified that he saw defendant, Ward, and Caffey together during the afternoon of November 16, 1995. As Pettaway and Ward were driving around Wheaton that afternoon, they met defendant and Caffey twice. On both occasions, defendant, Caffey, and Ward had a brief conversation. Pettaway further testified that, the following day, he saw defendant at a car wash vacuuming the back seat area of the gray four-door car she was driving.

Defendant’s sister, Tina Martin, testified that, around 6:50 p.m. on November 16, 1995, Ward came to the house Tina shared with her mother on Crescent Street in Wheaton. Ward made a telephone call to Debra Evans. Tina overheard a portion of their conversation, during which Ward asked, “Is the baby mine, or is it his.” Ward left the Martin house around 8:10 p.m.

Cynthia Sawyer, a friend of Debra and defendant, testified that Debra and defendant had lived together at one time. Sawyer further testified that Ward and Debra had argued about the paternity of Jordan for several years before the murders. A few days before the murders, Sawyer observed defendant wearing an Ace bandage on her right arm.

According to the testimony of several State witnesses, defendant was unable to have children in 1995, but, in the months before the murders, pretended that she was pregnant. Defendant’s sister, Tina Martin, testified that defendant told her that she was pregnant in April 1995. Defendant said that the baby was due in August, and Tina held a baby shower for defendant. Defendant later told her sister that the baby was due in October. She did not have a baby in October but continued to claim that she was pregnant. Darlene Bearden, defendant’s probation officer, testified that, on November 1, 1995, defendant told her over the telephone that she had given birth. At an appointment on November 9, defendant told Bearden that she had named the baby Elijah.

Following the presentation of this evidence, the State rested its case in chief. Defendant’s case consisted primarily of testimony intended to impeach Scott and Pruitt’s testimony. One police officer testified that she showed Scott a photo array on January 19, 1996. Scott selected a photo of Bo Wilson from this array and, contrary to her trial testimony, stated that she was “fairly positive” that he was the other man in the Schaumburg townhouse when she, defendant, and Joshua arrived there. Scott told the officer that Wilson appeared angry that Joshua was with her and defendant. Scott also stated that Wilson was a gang member, terrified her, and had threatened her.

Another police officer testified that, when Scott spoke to him on November 17, she said that Joshua had told her that four black men had entered the Addison apartment and two of them had come through the bedroom window. In addition, she stated that Joshua had said that, after the “bad men” left, he ran out and found defendant. Still another police officer testified that Scott had told him on November 18 that she did not know who held Joshua as Caffey stabbed him. Defendant also presented the testimony of a police officer who stated that Pruitt had said that he first heard of the murder on the 10 a.m. news, and Scott returned to the apartment around 11 a.m.

The only other witness for the defense was Kim Young, another friend of defendant. She testified that defendant had made false claims of pregnancy several times prior to 1994 as part of a “female game” they played to keep the men they were dating. In addition, the defense presented two stipulations. According to one, the time of Pruitt’s 911 call was 12:44 p.m. According to the other, during an interview on November 18, 1995, with assistant State’s Attorneys, Scott said that Caffey wanted defendant to take Joshua to the projects on the south side, but defendant had told Caffey that Joshua could be hurt there.

In rebuttal, the State called a police officer, who testified that, on November 18, 1995, Scott stated that defendant held Joshua while Caffey stabbed him.

The jury found defendant guilty of the first degree murders of Debra, Samantha, and Joshua Evans. In addition, the jury found her guilty of the aggravated kidnappings of Joshua and Elijah.

At the first stage of defendant’s sentencing hearing, the jury considered the evidence presented at trial and defendant’s convictions for first degree murder and aggravated kidnapping. In addition, the State presented evidence that defendant’s date of birth was December 22, 1966. The jury returned eight separate eligibility verdicts. In connection with Debra Evans’ murder, the jury found defendant eligible for the death penalty under the multiple-murder and felony-murder statutory aggravating factors. See 720 ILCS 5/9–1(b)(3), (b)(6) (West 1994). In connection with Samantha Evans’ murder, the jury found defendant eligible for the death penalty under the multiple-murder and brutal and heinous murder of a child under 12 statutory aggravating factors. See 720 ILCS 5/9–1(b)(3), (b)(7) (West 1994). In connection with Joshua Evans’ murder, the jury found defendant eligible for the death penalty under the multiple-murder, felony-murder, brutal and heinous murder of a child under 12, and murder of a witness statutory aggravating factors. See 720 ILCS 5/9–1(b)(3), (b)(6), (b)(7), (b)(8) (West 1994).

At the second stage of sentencing, the State presented evidence concerning defendant’s criminal history. This history included evidence that, in 1988, defendant had been sentenced to court supervision for the offense of theft by deception and for the offense of retail theft. In 1991 she was arrested for credit card fraud. In addition, she was convicted of theft based on her 1991 possession of jewelry and checks that had been stolen during a series of burglaries in the area around the Wheaton house she shared with a male companion. In 1993, defendant and another woman were arrested for cashing and attempting to cash forged checks at local banks. The checks had been stolen from the office of a Wheaton attorney whose office defendant’s mother cleaned. According to the woman arrested with defendant, they planned to give the money from the forged checks to defendant’s male companion. Defendant was convicted of forgery.

Defendant’s probation officers testified that, in January 1992, defendant was sentenced to 24 months of probation for felony theft. Defendant was sentenced to additional terms of probation for violating the terms of her probation and remained on probation in November 1995.

One of defendant’s friends testified that, in January 1995, she and defendant visited Caffey in the hospital. Defendant said that she had accidentally stabbed Caffey, and Caffey’s lung had been punctured. A few months earlier, Caffey and his friends had severely beaten defendant.

Members of the Du Page County sheriff’s office testified concerning defendant’s conduct in jail while awaiting trial in this case. In July 1996, a comb that had been fashioned into a shank was found hidden in defendant’s cell. Later that year, defendant grabbed the shoulder of a sheriff’s deputy as he was escorting another inmate past defendant’s cell.

Christie DeSmedt, the administrator for the general assistance program for Milton Township in Wheaton, described a document she found in defendant’s general assistance file. This document was an application in defendant’s name for one of the holiday baskets local organizations and individuals donated to needy families through a township program. The application, which was dated November 6, 1995, gave an address on Crescent in Wheaton and provided defendant’s mother’s telephone number. It listed the names and ages of defendant’s three children, as well as a fourth child, Fedell, age one month.

In addition to this evidence in aggravation, the State presented victim impact statements read by Debra’s father and sister and Samantha’s father.

In mitigation, defendant presented the testimony of an inmate who met Ward in the Du Page County jail. The inmate testified that, in February 1997, he and some other inmates were engaged in horseplay. Ward told them to stop or he would “f— [them] up like [he] did that b–– in Addison.”

An Addison police detective testified for the defense that another inmate contacted police concerning a conversation he had had with Ward in jail. According to this inmate, Ward had said he went to Debra’s apartment with $2,000, some of which he planned to give to Debra in exchange for the unborn baby. He and Debra had an argument, however, and she would not take the money.

Debra’s sister Katy Evans testified that, in August 1995, Ward had indicated that he wanted the baby Debra was carrying, but Debra said that there was no way that he was going to get any of her children. Two days before the murder, Debra told Katy that Ward was harassing her and picking fights with her and that she was worried. Debra said that she was scared something was going to happen and asked Katy to take her children.

An Addison police officer testified that she showed Patrice Scott a photo array. Scott began to cry when she looked at one photo and stated that she was scared to identify the individual in the photo. Scott stated that this individual was Calvin “Bo” Wilson and that Wilson was the other man at the Schaumburg townhouse. He was surprised that Joshua was still alive and upset that defendant had brought Scott to the townhouse. He threatened to kill Scott and her daughters.

The defense also presented the testimony of several police officers who described incidents of domestic violence between defendant and her boyfriends. According to these police officers, in January 1990, defendant made a complaint that a boyfriend, with whom she had just ended a relationship, entered her apartment, punched her in the face, and choked her. The boyfriend’s niece had threatened defendant with a .25-caliber semiautomatic pistol.

In 1991 and 1993 police responded to four calls of domestic violence involving defendant and another boyfriend. In connection with these incidents, the boyfriend was charged with, 
inter alia
, battery, aggravated assault, and domestic battery. These charges were based on conduct including choking defendant, threatening her with a loaded gun, hitting her in the head with a crescent wrench, and dragging her by her hair.

In 1994, defendant made two complaints of domestic violence against Caffey. She told police that Caffey had thrown bricks at the car in which she was riding, had pushed her, and had struck her in the face. Based on these allegations, Caffey was charged with criminal damage to property and domestic battery.

Tina Martin testified that she and defendant grew up in Wheaton. Tina had witnessed one of defendant’s boyfriends physically abusing her, and defendant’s children had told her that another boyfriend beat defendant frequently. Tina had observed defendant with bruises on her face. According to Tina Martin, defendant is too trusting of people and has poor judgment in her choice of friends.

Defendant’s mother, Martha Martin, testified that defendant dropped out of high school during her sophomore year when she became pregnant with her son. According to Martin, defendant did not have trouble in school and had a normal relationship with her and a good relationship with her father. Martin testified that defendant could be influenced by other people, but she was a good mother and loved children.

Dr. Frank Cushing, a psychologist who evaluated defendant in 1996, testified that defendant had a full scale IQ of 81, which is below average or borderline mentally retarded. Dr. Cushing diagnosed defendant with major depression and opined that she suffered from this condition prior to the murders. In addition, Dr. Cushing found that defendant had a generalized anxiety disorder and a borderline personality disorder with dependent features. Characteristics of a borderline personality disorder that defendant possessed included volatile interpersonal relationships, impulsivity, rapid mood swings, instances of poorly controlled anger, and fear of abandonment and rejection.

Dr. Cushing testified that, because of defendant’s dependent personality traits and her history of abuse, she was psychologically vulnerable to predatory males. Dr. Cushing speculated that threats from these men could cause defendant to act in ways she would not normally act. He opined that there was a strong possibility that defendant was coerced by Ward and Caffey into participating in the murders and aggravated kidnappings of members of the Evans family. Based on his evaluation, Dr. Cushing believed that defendant was more susceptible to coercion than the average person.

Dr. Cushing also diagnosed defendant as having a paranoid personality disorder with antisocial traits. Her inability to accept blame for her actions was characteristic of the paranoid personality disorder. Her repeated violation of the law, deceitfulness, and lack of remorse were antisocial traits. Dr. Cushing testified that these disorders may be treated through the administration of psychotropic medications. In addition, individuals with antisocial personality disorders adjust well to structured environments, such as prison.

Du Page County jail employees testified that, while defendant was in the jail, she was disciplined for offenses such as having extra linen, not wearing her uniform correctly, having an unauthorized pen, possessing a plastic shank, and throwing water on another inmate. The watch supervisor also testified that defendant had requested to be placed in administrative segregation in order to avoid confrontations with other inmates.

The defense also presented testimony that, in 1993, defendant completed a program to become a certified nursing assistant. While she was in jail on the murder charges, defendant obtained her general equivalency diploma (GED).

The jury found no mitigating factors sufficient to preclude the imposition of the death penalty, and the circuit court sentenced defendant to death based on her first degree murder convictions. The circuit court held an additional sentencing hearing on defendant’s two aggravated kidnapping convictions. The circuit court imposed a 15-year sentence for each conviction and ordered these sentences to run consecutively. Defendant’s death sentence was stayed, pending direct review by this court.

ANALYSIS

I. Voir Dire

We begin by addressing defendant’s challenge to the selection of the jury in her case. Prior to 
voir dire
, defendant filed a motion in which she asked the circuit court to prohibit the State from exercising peremptory challenges against venirepersons who indicated reservations against the death penalty. The circuit court denied the motion. During 
voir dire
, the defense objected, consistent with its motion, to the State’s exercise of peremptory challenges against four prospective jurors and two prospective alternate jurors. According to defendant, a new sentencing hearing is required because the State’s use of peremptory challenges to exclude these jurors was unconstitutional under 
Witherspoon v. Illinois
, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968).

A prospective juror may be excused for cause based on his or her views on the death penalty only if those views “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.” 
People v. Terrell
, 185 Ill. 2d 467, 488 (1998), citing 
Wainwright v. Witt
, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852 (1985). In 
Witherspoon
, the United States Supreme Court held that a prospective juror may not be removed for cause solely because he or she expresses a general objection to the death penalty. 
People v. Armstrong
, 183 Ill. 2d 130, 143 (1998), citing
 Witherspoon
, 391 U.S. at 522, 20 L. Ed. 2d at 784-85, 88 S. Ct. at 1777. The Court explained that, if the State were permitted to remove all such jurors, it would not only produce a jury capable of imposing the death penalty, it would create a jury “uncommonly willing to condemn a man to die.” 
Witherspoon
, 391 U.S. at 521, 20 L. Ed. 2d at 784, 88 S. Ct. at 1776 (1968).

Defendant contends that the concerns that motivated the 
Witherspoon
 holding with respect to challenges for cause also apply to the State’s use of peremptory challenges. Thus, according to defendant, the State should be prevented from using peremptory challenges to accomplish what 
Witherspoon
 prevents it from doing with its challenges for cause.

As defendant acknowledges, however, this court has previously rejected the argument she makes. See 
People v. Coleman
, 168 Ill. 2d 509, 549 (1995), citing 
People v. Williams
, 161 Ill. 2d 1, 55-56 (1994); 
People v. Howard
, 147 Ill. 2d 103, 136-38 (1991); 
People v. Stewart
, 104 Ill. 2d 463, 481-82 (1984). Defendant offers us no persuasive reason to reconsider those holdings, and we decline to do so.

II. Trial

With respect to the guilt-innocence phase of proceedings in defendant’s case, defendant argues that her convictions for the murders of Debra and Samantha Evans must be reversed based on insufficient evidence. In addition, she contends that she is entitled to a new trial as a result of two erroneous evidentiary rulings by the circuit court. According to defendant, the circuit court erred when it permitted Scott and Pruitt to testify concerning statements Joshua made to them. In addition, defendant asserts that the circuit court improperly limited the jury’s consideration of testimony that Scott identified Bo Wilson in a photo array. Defendant does not challenge the circuit court’s denial of her motion to suppress her statements to police or the admission of these statements at trial.

A. 
Sufficiency of the Evidence

According to defendant, her convictions for the murders of Debra and Samantha Evans must be reversed because there was no evidence that defendant inflicted any injuries to Debra or Samantha. Defendant further contends that the State failed to prove that she was accountable for Debra’s and Samantha’s murders because there was no evidence that she knew that Ward, Caffey, or the unidentified third man went to the Evans apartment with the intent to commit a crime or that she joined this group with knowledge that criminal acts were going to occur. Defendant does not contend that there was insufficient evidence to support her conviction for Joshua’s murder or her convictions for the aggravated kidnappings of Joshua and Elijah.

When a defendant challenges the sufficiency of the evidence supporting her conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 
People v. Heard
, 187 Ill. 2d 36, 85 (1999). It is the responsibility of the trier of fact to determine the credibility of witnesses, to weigh their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence. 
People v. Brooks
, 187 Ill. 2d 91, 132 (1999). A reviewing court will not overturn a defendant’s conviction based on insufficient evidence unless the proof is so improbable or unsatisfactory that a reasonable doubt exists as to the defendant’s guilt. 
People v. Taylor
, 186 Ill. 2d 439, 445 (1999).

Section 5–2(c) of the Criminal Code of 1961 provides that a person is legally accountable for the criminal conduct of another if “[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense.” 720 ILCS 5/5–2(c) (West 1994). To prove that the defendant possessed the intent to promote or facilitate the crime, the State may present evidence which establishes beyond a reasonable doubt that (1) the defendant shared the criminal intent of the principal or (2) there was a common criminal design. 
In re W.C.
, 167 Ill. 2d 307, 337 (1995). A defendant’s intent may be inferred from the nature of her actions and the circumstances accompanying the criminal conduct. 
People v. Perez
, 189 Ill. 2d 254, 266 (2000). Under the common-design rule, if “two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts.” 
In re W.C.
, 167 Ill. 2d at 337. Words of agreement are not needed to establish a common design; rather, like intent, a common design may be inferred from the circumstances surrounding the commission of the crime. 
People v. Batchelor
, 171 Ill. 2d 367, 376 (1996). Mere presence at a crime, even when combined with knowledge that a crime is being committed and flight from the scene, is insufficient to establish guilt by accountability. 
People v. Shaw
, 186 Ill. 2d 301, 323 (1998). However, “[e]vidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another.” 
In re W.C.
, 167 Ill. 2d at 338.

Viewing the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could have found beyond a reasonable doubt that defendant was accountable for Debra’s and Samantha’s murders. Evidence presented at trial indicated that defendant aided and abetted Ward and Caffey in the planning and commission of Debra’s and Samantha’s murders and that these murders were committed in furtherance of a common design to take Elijah from Debra by force.

With respect to defendant’s role in the planning and commission of the murders, there was testimony that, during the months that preceded the murders, defendant attempted to obtain a gun from Pruitt. One week before the murders, defendant visited the Evans apartment and asked Edwards when he left for work and how he traveled to work. Hours before the murders, defendant was seen having two conversations with Ward and Caffey. Defendant admitted in her written statement that she stood next to Caffey as he cut open Debra’s abdomen, and there was medical testimony that more than one person would have been required to make the incision to her uterus and remove the baby. Further, a bloody Ace bandage was discovered in a bedroom in the Evans apartment. Edwards had not seen this bandage before, and defendant had been seen wearing an Ace bandage on her arm a few days before the murders.

Evidence of defendant’s participation in a common design to take Elijah from Debra by force included testimony that Ward was Elijah’s father, that Ward and Debra had argued about the baby’s paternity, and that defendant knew that Ward and Caffey went to the Evans apartment to talk to Debra about the unborn baby and to “teach [her] a lesson.” There was also evidence that defendant and Caffey wanted Elijah and planned to pretend he was their son. In her written statement, defendant admitted that she and Caffey wanted a light-skinned baby boy but had been unable to have one. Defendant knew that Debra had planned to enter the hospital to give birth on Monday, November 20. During the months that preceded the murders, defendant had made false claims that she was pregnant and indicated that her due date was in October, a few weeks before Debra was due to give birth. A few days before the murders, defendant told her probation officer that she had given birth to a baby named Elijah, the name that Debra had chosen for the child she was carrying. After the murders, defendant told her mother, sister, and police that Elijah was her son. Evidence of defendant’s presence in the Evans apartment during the murders, her flight from the apartment with Ward and Caffey, her failure to report the murders to police, and her continued close affiliation with Caffey after the murders also supported a finding of common design. See 
Batchelor
, 171 Ill. 2d at 376. Based on this evidence, we believe a rational jury could have found defendant accountable for Debra’s and Samantha’s murders, and we reject defendant’s challenge to the sufficiency of the evidence.

B. 
Admission of Joshua’s Statements

Next, defendant argues that the admission of evidence concerning Joshua’s statements deprived her of a fair trial. Prior to trial, the State filed a petition seeking the admission of Joshua’s statements under section 115–10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115–10 (West 1994)). The State also offered the statements under the excited utterance or spontaneous declaration exception to the hearsay rule. Defendant filed a motion 
in limine
 to exclude these statements.

The circuit court held a hearing on the State’s petition and defendant’s motion 
in limine
. At the hearing, an Addison police department detective summarized the evidence discovered by police during their investigations of the murders and kidnappings of members of the Evans family. Scott and Pruitt also testified. Their testimony at the hearing was essentially the same as their trial testimony, although they did provide some additional detail concerning their communications with Joshua and his mental state. Scott testified that, when Joshua first awakened on November 17, he was very upset and said he was worried about his mother. Scott offered Joshua something to eat or drink, but he declined. According to Pruitt, Joshua was scared, crying, and talking in a frantic voice as he told Scott the events leading up to his arrival at her apartment. After Scott’s daughters left for school, Joshua acted hysterical and upset. He repeated his story about the burglars and said that he had to go back to the apartment to get his little brother.

The defense presented testimony by police officers and detectives who had spoken to Scott and Pruitt. The police testimony showed differences between what these individuals had told police and their testimony at the hearing.

At the conclusion of the hearing, the circuit court ruled that all of Joshua’s statements were admissible under section 115–10. In addition, the circuit court held that, except for his denial that he took medication, Joshua’s statements were also admissible under the common law spontaneous declaration exception to the hearsay rule.

Defendant argues that Joshua’s statements were inadmissible hearsay and should not have been admitted under either the statutory or the spontaneous declaration exception to the hearsay rule. We begin with an examination of the circuit court’s decision to admit the statements under section 115–10 of the Code of Criminal Procedure. Section 115–10 provides in relevant part:

“(a) In a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13 *** at the time the act was committed ***, the following evidence shall be admitted as an exception to the hearsay rule:

***

(2) testimony of an out of court statement made by such child *** describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act perpetrated upon or against a child ***.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child ***:

***

(B) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement.” 725 ILCS 5/115–10 (West 1994).

Under this statute, the State has the burden of proving that the time, content, and circumstances of the statement provide sufficient safeguards of reliability. 
People v. Zwart
, 151 Ill. 2d 37, 43 (1992).

With respect to the applicable standard of review, this court has held that the circuit court’s decision to admit evidence under section 115–10 will not be reversed unless the record clearly demonstrates that the circuit court abused its discretion. See 
People v. Bowen
, 183 Ill. 2d 103 (1998); 
Zwart
, 151 Ill. 2d at 44. Defendant contends, however, that a 
de novo
 standard of review should apply to the circuit court’s evidentiary rulings under section 115–10. According to defendant, in 
People v. Coleman
, 183 Ill. 2d 366 (1998), this court “seemingly” overruled the standard of review set forth in 
Bowen
 and 
Zwart. 
Defendant relies on a statement in 
Coleman
 that “courts of review have traditionally reserved the abuse of discretion standard for those decisions of the lower court which deserve great deference on review, 
i.e.
, decisions made by the trial judge in overseeing his or her courtroom or in maintaining the progress of a trial” (
Coleman
, 183 Ill. 2d at 387). 
Defendant asserts that determining the admissibility of a statement under section 115–10 does not involve the progress of the trial or the administration of the courtroom. Instead, she argues, it is a legal decision and, therefore, should be reviewed 
de novo
. We disagree.

Contrary to defendant’s assertion, our decision in 
Coleman
 did not affect holdings in 
Bowen
 and 
Zwart
 that the abuse of discretion standard of review applies to admissibility determinations under section 115–10. In 
Coleman
, unlike 
Bowen
 and 
Zwart
, the admissibility of hearsay statements under section 115–10 was not at issue. In 
Coleman
, we held that a 
de novo
, rather than an abuse of discretion or manifestly erroneous, standard of review applies to a circuit court’s decision to dismiss a defendant’s claims under the Post-Conviction Hearing Act (725 ILCS 5/122–1 
et seq.
 (West 1994)) without an evidentiary hearing. Also, the language in 
Coleman
 on which defendant relies does not suggest that the application of an abuse of discretion standard is inappropriate for decisions concerning the admissibility of evidence. In 
Coleman
, we explained that an abuse of discretion standard should not apply at the dismissal stage of post-conviction proceedings because there are no factual inquiries at that stage. Admissibility determinations under section 115–10 involve factual inquiries, as illustrated by the statutory requirement that a hearing be conducted. See 725 ILCS 5/115–10(d)(1) (West 1994). Thus, 
Coleman
 is inapplicable. Moreover, in decisions since 
Coleman
, this court has reiterated that an abuse of discretion standard of review applies to evidentiary decisions by the circuit court. See, 
e.g.
, 
People v. Buss
, 187 Ill. 2d 144, 219 (1999); 
Heard
, 187 Ill. 2d at 58; 
People v. Bull
, 185 Ill. 2d 179 (1998). Accordingly, we will not reverse the circuit court’s decision to admit Joshua’s statements under section 115–10 absent an abuse of discretion.

As to the merits of this evidentiary issue, defendant contends that the circuit court erred in admitting Joshua’s statements under section 115–10 because (1) the statements did not relate to an offense against Joshua, (2) the circuit court improperly relied on a finding that Joshua had been concealed from his “stepfather,” and (3) the statements could not satisfy the constitutional or statutory requirements for reliability because the witnesses who described them, Scott and Pruitt, were not credible.

Defendant asserts that testimony concerning Joshua’s statements should not have been admitted under section 115–10 because the statements failed to satisfy the statutory requirement that they “pertain[ ] to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act perpetrated upon or against a child.” 725 ILCS 5/115–10(a)(2) (West 1994). According to defendant, testimony concerning Joshua’s description of the events in the Evans apartment should not have been admitted because it concerned offenses committed against individuals other than Joshua. In addition, defendant argues that Joshua’s statements that he did not take medicine and was not a liar did not pertain to the charge that defendant committed an aggravated kidnapping of Joshua.

We hold that the circuit court properly found that, in the statements at issue, Joshua related an “act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against” him. With respect to the events in the Evans apartment, Joshua stated that burglars entered his apartment and cut his mother and sister, that his mother and sister were dead, that his brother was left in the apartment, that the burglars were Annette, Fedell, and Vern, and that he hid and ran out after defendant. In addition, when defendant accused him of lying, Joshua stated, “No, no, that’s what happened.”

These statements pertained to acts that were elements of the aggravated kidnapping charge against defendant. Aggravated kidnapping may be proved with evidence of secret confinement of a child under the age of 13 without the consent of his parent or guardian. See 720 ILCS 5/10–1(a)(1), 10–2(a)(2) (West 1994). Joshua’s statements explained how and why Joshua came to be confined by defendant and established that the confinement was without the consent of his mother.

Similarly, Joshua’s statement, “What medicine, I don’t take any medication,” related to the acts that formed the basis of defendant’s charge for Joshua’s murder. This statement was relevant to determining the nature of the substance defendant had given him, as well as her role in the acts that caused his death.

In support of her argument that Joshua’s statements describing the events in the Evans apartment were inadmissible because they pertained to offenses against individuals other than Joshua, defendant cites 
People v. Peck
, 285 Ill. App. 3d 14 (1996). In that case, the court held that statements by one sexual abuse victim about the defendant’s sexual abuse of another victim were not admissible under section 115–10 because the State failed to show that the statements involved “ ‘components of the contemporaneous and ongoing series of events constituting 
a matter or detail pertaining to the offense perpetrated against 
[the declarant]
 herself
.’ ” (Emphasis in original.) 
Peck
, 285 Ill. App. 3d at 17, quoting 
People v. Embry
, 249 Ill. App. 3d 750, 763 (1993). For example, the 
Peck
 court held that one of the victims’ statement that, as she watched from a tree, she had seen the defendant sexually abuse the other victim was inadmissible because it clearly did not involve a matter or detail pertaining to an act committed contemporaneously against the declarant. 
Peck
, 285 Ill. App. 3d at 17-18.

In the case before us, by contrast, the acts against Joshua’s mother and sister did pertain to offenses against Joshua. Joshua’s description of his mother’s murder showed he was taken without her consent, and his witnessing of his mother’s and sister’s murders provided the reason for his kidnapping and murder. Accordingly, the circuit court did not abuse its discretion in finding that the admission of evidence concerning Joshua’s statements complied with subsection (a)(2) of section 115–10.

Defendant also attacks the circuit court’s decision to admit Joshua’s statements under section 115–10 on the basis that the circuit court relied on a mistaken belief that Edwards was Joshua’s stepfather. In deciding that Joshua’s statements related to elements of the aggravated kidnapping charge, the circuit court found that these statements showed Joshua’s secret confinement from his stepfather. According to defendant, Edwards was not Joshua’s stepfather, and the circuit court’s mischaracterization of the relationship between Edwards and Joshua requires reversal of its decision that Joshua’s statements were admissible under section 115–10. Defendant explains: “the court’s ruling depended on a finding that Joshua had been concealed from his parent or legal guardian. [Citation.] As James Edwards was neither Joshua’s parent nor his legal guardian, that ruling is reversible error.”

At trial, defendant failed to object to the circuit court’s characterization of Edwards as Joshua’s stepfather, and her post-trial motion makes no mention of the circuit court’s conclusion that Edwards was Joshua’s stepfather. In her reply brief, defendant asserts that she preserved her argument regarding Edwards by generally objecting to the admissibility of Joshua’s statements and by arguing in her post-trial motion that the circuit court erred in admitting these statements. Due to defendant’s failure to specifically raise this issue in the circuit court, however, we agree with the State that it is waived. See, 
e.g.
, 
People v. Byron
, 164 Ill. 2d 279, 293 (1995); 
People v. Towns
, 157 Ill. 2d 90, 100 (1993); 
People v. Enoch
, 122 Ill. 2d 176, 186 (1988); see also 725 ILCS 5/116–1(c) (West 1994).

Defendant argues that we may nevertheless recognize the error as plain error. The State contends that we may not consider defendant’s plain error argument because defendant raised it for the first time in her reply brief, and, under Supreme Court Rule 341(e)(7), “[p]oints not argued are waived and shall not be raised in the reply brief.” 177 Ill. 2d R. 341(e)(7). We disagree that defendant’s failure to include her plain error argument in her opening brief precludes us from considering it.

The rules of waiver are applicable to the State as well as the defendant in criminal proceedings, and the State may waive an argument that the defendant waived an issue by failing to argue waiver in a timely manner. See, 
e.g.
, 
People v. Henderson
, 142 Ill. 2d 258, 283 (1990) (finding that the State waived its argument that the defendant failed to make a timely 
Batson
 objection by failing to make this argument in the trial court); 
People v. O’Neal
, 104 Ill. 2d 399, 407 (1984) (“The principle of waiver applies to the State as well as the defendant in a criminal case”). Under these principles, in order to obtain review of an argument that a defendant waived an issue for review, the State must raise this argument in its appellee’s brief. See 177 Ill. 2d R. 341(e)(7). Accordingly, we believe it would be unfair to require a defendant to assert plain error in his or her opening brief.

Moreover, in applying the plain error doctrine to review claims not preserved at the trial level, this court has stated that the purpose of the plain error rule is to guard “against the ‘possibility that an innocent person may have been convicted due to some error which is obvious from the record, but not properly preserved’ ” (
People v. Ward
, 154 Ill. 2d 272, 294 (1992), quoting 
People v. Carlson
, 79 Ill. 2d 564, 576 (1980)) and to protect and to preserve the integrity and the reputation of the judicial process (
People v. Gard
, 158 Ill. 2d 191, 205 (1994)). These considerations also justify our consideration of a defendant’s plain error argument despite his or her failure to include it in an opening brief. Indeed, this court has previously considered a defendant’s plain error argument raised for the first time in a reply brief. See 
People v. Thomas
, 178 Ill. 2d 215, 235 (1997).

Although we find it appropriate to consider defendant’s plain error argument, we conclude that no plain error resulted from the circuit court’s mistaken characterization of Edwards as Joshua’s stepfather. Under the plain error doctrine, a reviewing court may consider a trial error not properly preserved when (1) the evidence in a criminal case is closely balanced or (2) where the error is so fundamental and of such magnitude that the accused was denied a right to a fair trial. 
Byron
, 164 Ill. 2d at 293. Absent reversible error, however, there can be no plain error. See 
People v. Keene
, 169 Ill. 2d 1, 17 (1995). No reversible error occurred as a result of the circuit court’s characterization of Edwards as Joshua’s stepfather.

The aggravated kidnapping statute requires that a child’s confinement be against the will of the child. Confinement of a child is deemed against the child’s will if it is without the consent of a parent or legal guardian. 720 ILCS 5/10–1(b), 10–2(a)(2) (West 1994). At the hearing, there was evidence that Edwards was Debra’s live-in boyfriend, had acted as a father figure to Joshua, and that Joshua called him his “stepdad.” There was no evidence that Edwards had any legal status as Joshua’s stepfather or guardian.

As the State argues, however, we may affirm the circuit court’s decision for any appropriate reason, regardless of whether the circuit court relied on those grounds and regardless of whether the circuit court’s reasoning was correct. See, 
e.g.
, 
Buss
, 187 Ill. 2d at 205; 
People v. Novak
, 163 Ill. 2d 93, 101 (1994). Even assuming the circuit court erred in basing its admissibility determination on a finding that Joshua was confined without the consent of Edwards, who was not his parent or legal guardian, we may affirm the circuit court based on evidence that defendant confined Joshua without the consent of his mother. As stated, Joshua’s description of the events in the Evans apartment related to this element by describing how his mother was killed and how he was taken from the apartment. Thus, the circuit court properly admitted these statements under section 115–10 regardless of its error with respect to the relationship between Joshua and Edwards.

Defendant further contends that the circuit court erred in admitting Joshua’s statements under section 115–10 “because Patrice Scott and Dwight Pruitt, the ‘conduits’ for the hearsay statement, were so unreliable themselves that the statements satisfy neither constitutional nor statutory requirements for reliability.” In support of this argument, defendant relies on evidence of inconsistencies in Scott’s and Pruitt’s testimonies and their statements to police. For example, defendant recites evidence that Scott failed to initially tell police that Joshua said Caffey was involved in the crimes and that Joshua had been fatally stabbed; first told police that she and defendant had stopped at a Wal-Mart store, left Joshua in Maywood, and then traveled to defendant’s townhouse; and told police that Joshua had said four black males rather than four burglars had entered the apartment. With respect to Pruitt’s reliability, defendant relies on evidence that Pruitt was an incarcerated gang member and failed to initially tell police the names of the perpetrators identified by Joshua. Further, Pruitt told police that defendant brought Elijah to the Villa Park apartment with her, that he had seen the story about Joshua on the 10 a.m. news, that defendant and Scott had returned to the Villa Park apartment at 11 a.m., and that defendant and Scott left Joshua in Maywood before going to Schaumburg.

To satisfy the requirements of the confrontation clause of the sixth amendment to the United States Constitution, hearsay statements of an unavailable child declarant admitted under an exception to the hearsay rule must bear adequate “indicia of reliability.” 
Idaho v. Wright
, 497 U.S. 805, 816, 111 L. Ed. 2d 638, 653, 110 S. Ct. 3139, 3147 (1990). A hearsay statement possesses sufficient “indicia of reliability” (1) if the hearsay statement falls within a firmly rooted hearsay exception or (2) if there is a showing of “ ‘particularized guarantees of trustworthiness.’ ” 
Wright
, 497 U.S. at 816, 111 L. Ed. 2d at 653, 110 S. Ct. at 3147, quoting 
Ohio v. Roberts
, 448 U.S. 56, 66, 65 L. Ed. 2d 597, 608, 100 S. Ct. 2531, 2539 (1980). Section 115–10 does not contain a firmly rooted hearsay exception. See 
People v. March
, 250 Ill. App. 3d 1062, 1073 (1993). However, under section 115–10, a hearsay statement by a child declarant may not be admitted unless the circuit court first finds “in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability.” 725 ILCS 5/115–10 (West 1994).

In the instant case, the circuit court found that the time, content, and circumstances of Joshua’s statements provided sufficient safeguards of reliability to permit their introduction under section 115–10. In addition, the circuit court decided that Joshua’s statements possessed the “particularized guarantees of trustworthiness” required by 
Wright
 for admission under the confrontation clause
. 
In considering the time, content, and circumstances of Joshua’s statements, the circuit court expressly stated that it considered and weighed the credibility of the witnesses at the hearing.

Many of the inconsistencies in Scott’s and Pruitt’s testimonies and statements to police could be explained by the evidence that, when police first spoke to Scott, she was hysterical and afraid of Caffey, who had threatened to kill her and her family. Other inconsistencies, such as the time of the news story Pruitt viewed and defendant and Scott’s travels to Maywood and Schaumburg, did not relate to circumstances of Joshua’s statements. The circuit court was in the best position to assess the credibility of the witnesses at the hearing, and, after reviewing the record, we cannot conclude that the circuit court abused its discretion in admitting Joshua’s statements under section 115–10. See 
People v. R.D.
, 155 Ill. 2d 122, 146 (1993) (deferring to the circuit court’s credibility determination).

Having upheld the admission of Joshua’s statements under section 115–10, we also reject defendant’s argument that the circuit court erred in finding that certain statements by Joshua were admissible under the common law spontaneous declaration exception to the hearsay rule. After ruling that all of Joshua’s statements were admissible under section 115–10, the circuit court concluded that his statements about the events in the Evans apartment were also admissible under the spontaneous declaration exception to the hearsay rule. The circuit court found, however, that Joshua’s denial that he took medicine was not admissible under this common law exception because it did not relate to the events in the apartment. Nevertheless, the circuit court admitted this statement under section 115–10.

For a hearsay statement to be admissible under the spontaneous declaration exception, (1) there must be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, (2) there must be an absence of time for the declarant to fabricate the statement, and (3) the statement must relate to the circumstances of the occurrence. 
People v. Edwards
, 144 Ill. 2d 108, 169 (1991). In determining whether a hearsay statement is admissible under the spontaneous declaration exception, courts employ a totality of the circumstances analysis. 
People v. Georgakapoulos
, 303 Ill. App. 3d 1001, 1012 (1999); M. Graham, Cleary & Graham’s Handbook of Illinois Evidence §803.3, at 793 (7th ed. 1999). This analysis involves the consideration of several factors, including time, “the nature of the event, the mental and physical condition of the declarant, and the presence or absence of self-interest.” 
People v. House
, 141 Ill. 2d 323, 382 (1990).

In addition, the fact that a declarant’s statement is made at the first opportunity to speak supports a finding of spontaneity (see, 
e.g.
, 
People v. Gacho
, 122 Ill. 2d 221, 241 (1988)), but a declarant may make a spontaneous declaration to a person even after having spoken previously to another (
House
, 141 Ill. 2d at 386). Although a statement made in response to persistent interrogation might not be admitted under the spontaneous declaration exception (see, 
e.g.
, 
People v. Sommerville
, 193 Ill. App. 3d 161, 174-75 (1990)), the fact that a statement was made in response to a question does not necessarily destroy spontaneity (see, 
e.g.
, 
People v. Smith
, 152 Ill. 2d 229, 260 (1992); see also M. Graham, Cleary & Graham’s Handbook of Illinois Evidence §803.3, at 795-96 (7th ed. 1999)). That a statement is volunteered has also been found to support a finding of admissibility under the spontaneous declaration exception. See, 
e.g.
, 
People v. Merideth
, 152 Ill. App. 3d 304, 315 (1987). No one factor is dispositive. 
Georgakapoulos
, 303 Ill. App. 3d at 1012.

The time factor has been described as an “elusive” factor, “whose significance will vary with the facts of each case.” 
House
, 141 Ill. 2d at 382. Indeed, the period of time that may pass without affecting the admissibility of a statement under the spontaneous declaration exception varies greatly. See, 
e.g.
, 
People v. Gacho
, 122 Ill. 2d 221 (1988) (statement made 6½ hours after the occurrence was admissible); 
People v. Newell
, 135 Ill. App. 3d 417 (1985) (statement made 20 minutes after the occurrence was properly excluded). The critical inquiry is “ ‘whether the statement was made while the excitement of the event predominated.’ ”
 Smith
, 152 Ill. 2d at 260, quoting M. Graham, Cleary & Graham’s Handbook of Illinois Evidence §803.3, at 627 (5th ed. 1990).

Defendant does not dispute that the murders of Joshua’s sister and mother qualify as a startling event sufficient to produce a spontaneous and unreflecting statement. Defendant challenges, however, the circuit court’s finding that there was an absence of time for Joshua to fabricate his statements. According to defendant, by the time Joshua made his statements at 5 a.m. and 9 a.m. the day after the murders, the excitement of the murders had dissipated.

The evidence indicated that Joshua witnessed the murders of his mother and sister sometime between 10 p.m. and midnight on November 16. Scott’s testimony indicated that Joshua’s first statements to her about the events occurred at about 6 a.m. or 7 a.m. on November 17 and his statements denying that he was lying or took medication occurred shortly after defendant’s return to the Villa Park apartment around 9 a.m. Thus, 6 to 9 hours passed between the murders and Joshua’s first statements to Scott about the events, and 9 to 11 hours passed between the murders and his statements to defendant.

In other cases involving child declarants, courts have found that similar delays do not preclude the application of the spontaneous declaration exception. See M. Graham, Cleary & Graham’s Handbook of Illinois Evidence §803.3, at 796 (7th ed. 1999) (noting that courts have been liberal in applying the spontaneous declaration exception to children of tender years). For example, in 
People v. Chatman
, 110 Ill. App. 3d 19 (1982), the appellate court held that the statement of a four-year-old made 18 hours after witnessing a shooting was admissible where the child was emotionally distraught and was found in an uninhabited area. Similarly, in 
People v. Phillips
, 159 Ill. App. 3d 483, 491 (1987), the appellate court held that a 15-hour delay between a sexual assault and the statements of a 2½-year-old did not destroy the statement’s spontaneity because “[t]he stress caused by the defendant’s acts would have lingered long after the acts themselves were committed.” See also, 
e.g.
, 
Meredith
, 152 Ill. App. 3d at 316 (7½ hours). Based on this authority, we reject defendant’s argument that the passage of time between the murders and Joshua’s statements destroyed their spontaneity.

Further, we find that the other circumstances surrounding Joshua’s statements support the circuit court’s admission of these statements under the spontaneous declaration exception. Caffey and Ward entered the bedroom where Joshua and his sister were sleeping and fatally stabbed Samantha as Joshua watched. Joshua ran from the bedroom, only to see his mother, who had also been brutally murdered, lying in a blood-spattered living room. Joshua was then taken by his mother’s and sister’s killers to a strange apartment in the middle of the night. Certainly exhausted from the events, Joshua fell into a fitful sleep shortly after defendant left him with Scott. He cried out during his sleep and awakened crying early in the morning. After refusing Scott’s offer of food, he volunteered a description of the events at the Evans apartment. He spoke in a frantic voice and appeared scared. Although he listened to one of Scott’s children read a book, he became hysterical and upset again after the children left for school and expressed fear that the “burglars” would return. Defendant arrived, swore at him, and accused him of lying. Joshua, however, maintained that what he had said was correct. There is no evidence that Joshua had any motive to fabricate his version of events. Under these circumstances, we agree with the circuit court that the excitement of the murders predominated at the time Joshua made his statements in Scott’s apartment and that Joshua’s statements were a product of these events rather than reflection.

Defendant argues that the fact Scott described Joshua as “worried” proved that his statements were not spontaneous because worry results from reflection. We believe, however, that the evidence of Joshua’s mental state demonstrates that Joshua’s “worry” was fear and anxiety about his mother’s and sister’s murders and not reflection. We also cannot accept defendant’s argument that “[t]he fact that Joshua related a series of events, rather than making a simple statement, also shows that he reflected upon the events.” According to defendant, reflection was required for Joshua to organize the events in his mind. See 
People v. Smith
, 127 Ill. App. 3d 622, 628 (1984) (the fact that declarant gave a step-by-step description of his actions following the attack on his aunt suggested reflection). We decline to find that the mere fact that Joshua described a series of events demonstrates reflection. He stated only that burglars had entered his apartment through a window, that they had cut his mother and sister, and that he hid and ran out of the apartment after defendant, who brought him to Scott’s apartment. This was a very simplified description of the events in the Evans apartment, which Joshua could have related without reflection. Moreover, as noted, the totality of the circumstances surrounding his statements supports a conclusion that they were spontaneous. Accordingly, we hold that the circuit court correctly decided that, except for Joshua’s denial that he took medication, his statements were admissible under the spontaneous declaration exception to the hearsay rule.

In addition to challenging the admissibility of Joshua’s statements, defendant contends that the circuit court erred by failing to instruct the jury as required by section 115–10(c). Section 115–10(c) provides: “If a statement is admitted pursuant to this Section, the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, *** the nature of the statement, the circumstances under which the statement was made, and any other relevant factor.” 725 ILCS 5/115–10(c) (West 1994). Illinois Pattern Jury Instructions, Criminal, No. 11.66 (3d ed. 1992) (hereinafter IPI Criminal 3d) tracks this statutory language.

The State argues that defendant may not now claim that the circuit court erred by failing to instruct the jury according to IPI Criminal 3d No. 11.66 because she did not tender this instruction and did not object to the absence of this instruction in the trial court. In addition, the State asserts that any error resulting from the circuit court’s failure to give the instruction was harmless. Defendant does not dispute that she waived this issue for review. Instead, she asserts that we may consider it as plain error under Supreme Court Rules 451(c) (177 Ill. 2d R. 451(c)) and 615(a) (134 Ill. 2d R. 615(a)).

Under an exception to the waiver rule, Rule 451(c) permits a court to consider substantial defects in instructions despite a defendant’s failure to make a timely objection, if the interests of justice require. 
People v. Brown
, 172 Ill. 2d 1, 45-46 (1996). Under Rule 615(a), a procedural default may be excused when the evidence is closely balanced or when the error is of such magnitude that it deprives the defendant of a fair trial. 
People v. Alvine
, 173 Ill. 2d 273, 297 (1996).

Defendant argues that this court’s decision in 
People v. Mitchell
, 155 Ill. 2d 344 (1993), requires a finding in this case that the failure to instruct the jury according to IPI Criminal 3d No. 11.66 was plain error. In 
Mitchell
, this court held that the circuit court erred in admitting hearsay statements by a child alleging sexual abuse because the circuit court failed to conduct a hearing, as required by section 115–10, and because the record did not support a conclusion that the statements were reliable. We further held in 
Mitchell
 that it was error for the circuit court to fail to provide the jury with IPI Criminal 3d No. 11.66. In light of the prejudicial testimony concerning the child victim’s statements, which were improperly admitted without a hearing, and the inconsistencies in the victim’s testimony at trial, this court concluded that the evidence was sufficiently close that the circuit court’s failure to instruct the jury was plain error. 
Mitchell
, 155 Ill. 2d at 354.

Our decision in 
Mitchell
 does not support a finding of plain error in this case. Unlike the circuit court in 
Mitchell
, the circuit court in the case before us conducted a thorough hearing, and the record does not indicate that the circuit court’s conclusion that Joshua’s statements were reliable was an abuse of discretion. Moreover, all but one of Joshua’s statements admitted at trial were admissible under the spontaneous declaration exception to the hearsay rule, as well as section 115–10. Section 115–10 provided the exclusive basis for the admission of only Joshua’s statement that he did not take any medicine. IPI Criminal 3d No. 11.66 is not required when statements are admitted under the spontaneous declaration exception. See 
People v. Pitts
, 299 Ill. App. 3d 469, 478-79 (1998). Accordingly, we find that the circuit court’s failure to give this instruction did not deprive defendant of a fair trial.

C. 
Limiting Instruction

Defendant also claims that she was denied a fair trial by a limiting instruction the circuit court gave to the jury regarding its consideration of evidence of Scott’s identification of Bo Wilson. During her testimony at trial, Scott denied that the unidentified man at the Schaumburg townhouse was Bo Wilson. The defense presented the testimony of a police detective who had showed Scott a photo array in January 1996. According to this detective, a photograph of Bo Wilson was included in this array, and, upon viewing Wilson’s photograph, Scott became visibly upset. The detective testified that Scott said that she was fairly positive Wilson was the unidentified man in Schaumburg, that he had appeared angry that Joshua was with her and defendant, that he was a gang member, that he terrified her, and that he had made threats that caused her to fear for the safety of her family.

During closing argument, the defense argued that defendant was afraid of Caffey and Wilson, and, in committing the crimes against the Evans family, she was only following Caffey’s orders. As part of this argument, the defense stated:

“I suggest to you, also, that when she went to the house in Schaumburg and Bo Calvin Wilson was angry and surprised she brought Joshua there –”

The State interrupted, objecting that it was improper to argue these facts as substantive evidence. The circuit court instructed the jury that “any evidence that was introduced in impeachment that is in contradiction with the witness’ testimony here, by means of a prior inconsistent statement, is received for the purpose of your consideration and believability of that witness, and I so instruct you.” Subsequently, the defense argued: “You heard testimony that Bo Calvin Williams was in Schaumburg. Patrice Scott was afraid of him. She was afraid of him. Why would that not apply to Annette Williams and her children as well?”

Defendant now argues that Scott’s identification of Wilson supported the theory that defendant was the “unwitting observer of a crime committed by a group of violent men.” She contends that, by prohibiting the jury from considering Scott’s identification of Wilson as substantive evidence, the circuit court denied her a fair trial. According to defendant, this evidence was admissible substantively under section 115–12 of the Code of Criminal Procedure (725 ILCS 5/115–12 (West 1994)), which provides in relevant part: “A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him.” 725 ILCS 5/115–12 (West 1994). Based on this statutory exception, defendant contends that she was entitled to use Scott’s identification of Wilson to argue that Wilson was one of the men in the Evans apartment. In addition, defendant asserts that “because Scott’s fearful and agitated reaction to his photograph established the accuracy of her identification, the defense was entitled to argue that Patrice Scott was afraid of Bo Wilson.”

The State responds that defendant waived this issue by failing to include it in her post-trial motion and that she waived any claim of plain error by failing to assert it in her opening brief. In her reply brief, defendant argues that the issue may be considered as plain error.

As the State observes, defendant has waived this issue by failing to include it in her post-trial motion. See 
Enoch
, 122 Ill. 2d at 186. Although defendant’s failure to assert plain error in her opening brief does not preclude us from considering her plain error argument, we find that no plain error occurred as a result of the circuit court’s limiting instruction.

We agree with defendant that Scott’s identification could be admitted as substantive evidence under section 115–12, and, therefore, the circuit court erred in limiting the jury’s consideration of this evidence. This error, however, did not rise to the level of plain error.

As our discussion of defendant’s sufficiency of the evidence argument demonstrates, the evidence in this case was not closely balanced. Defendant has also failed to establish that the asserted error amounts to plain error under the second prong of the plain error analysis. Under this prong, relief under the plain error rule is proper only if “the error is of such magnitude that there is a substantial risk that the accused was denied a fair and impartial trial, and remedying the error is necessary to preserve the integrity of the judicial process.” 
People v. Nielson
, 187 Ill. 2d 271, 297 (1999). There was overwhelming evidence that defendant was accountable for Caffey’s and Ward’s acts in killing Debra and Samantha. Substantive admission of Scott’s identification of Wilson may have supported a conclusion that Wilson accompanied defendant, Caffey, and Ward to the Evans apartment. Such evidence would not, however, have changed defendant’s accountability for the events in the apartment, particularly since there was no evidence that Wilson had a role in these events. Further, even if the jury had considered Scott’s fear of Wilson as substantive evidence, there was no evidence that defendant was afraid of Wilson or that her actions resulted from any such fear. Thus, we find no plain error resulting from the circuit court’s limiting instruction.

III. Sentencing

We now turn to defendant’s assertions of error at the sentencing proceedings. At the first stage of the sentencing hearing, the jury returned eight separate eligibility verdicts. In connection with Debra’s murder, defendant was found eligible for the death penalty under the multiple-murder aggravating factor (720 ILCS 5/9–1(b)(3) (West 1994)) and the felony-murder aggravating factor (720 ILCS 5/9–1(b)(6) (West 1994)). With respect to the first degree murder of Samantha Evans, the jury also found the existence of two statutory aggravating factors: the multiple-murder aggravating factor (720 ILCS 5/9–1(b)(3) (West 1994)) and the factor concerning the brutal and heinous murder of a child under 12 years of age (720 ILCS 5/9–1(b)(7) (West 1994)). In regards to Joshua’s murder, the jury found defendant eligible under four statutory aggravating factors: multiple murder (720 ILCS 5/9–1(b)(3) (West 1994)), brutal and heinous murder of a child under 12 years of age (720 ILCS 5/9–1(b)(7) (West 1994)), felony murder (720 ILCS 5/9–1(b)(6) (West 1994)), and murder of a witness (720 ILCS 5/9–1(b)(8) (West 1994)).

Defendant challenges the validity of each of these eligibility verdicts. In addition, she asserts that she is entitled to a new second stage sentencing hearing because (1) the circuit court erred in admitting evidence of the holiday basket application and (2) her counsel were ineffective for failing to request an instruction on the statutory aggravating factor of compulsion.

A. 
Validity of Statutory Aggravating Factors

Defendant argues that all eight of the eligibility verdicts must be reversed for the following reasons: (1) the verdict forms relating to her eligibility under sections 9–1(b)(3) and 9–1(b)(6) were defective because they omitted the mental state elements of these statutory aggravating factors; (2) the nonpattern instructions the jury received under sections 9–1(b)(3), 9–1(b)(7), and 9–1(b)(8) did not require the jury to find the elements of the statutory aggravating factors but instead permitted the jury to base eligibility on a finding that “defendant was a major participant acting with a reckless indifference for human life while committing an Aggravated Kidnaping”; (3) there was insufficient evidence that defendant personally inflicted any injuries to Debra and therefore insufficient evidence to support her eligibility under section 9–1(b)(6); (4) there was insufficient evidence to establish defendant’s guilt for Debra’s and Samantha’s murders; (5) section 9–1(b)(7) is unconstitutional as applied to defendant because her eligibility under this factor could have been based on her accountability for Ward’s and Caffey’s actions in killing Joshua and Samantha; and (6) section 9–1(b)(7) is unconstitutionally vague on its face.

1. Eligibility Based on Section 9–1(b)(6) for Joshua’s Murder

We hold that defendant’s eligibility may be upheld based on the felony-murder statutory aggravating factor predicated on Joshua’s murder. “ ‘[W]here a defendant is found eligible based upon two or more statutory aggravating factors, the fact that one of those factors may later be invalidated will not generally impair the eligibility finding as long as a separate, valid aggravating factor supported eligibility.’ ” 
People v. Jackson
, 182 Ill. 2d 30, 64 (1998), quoting 
People v. Brown
, 169 Ill. 2d 132, 165 (1996). The Illinois death penalty statute does not place special emphasis on any single aggravating factor and gives no added significance to multiple aggravating factors as opposed to a single factor. 
People v. Macri
, 185 Ill. 2d 1 (1998). The purpose of finding a statutory aggravating factor at the first stage of sentencing is to narrow the class of persons convicted of murder who are eligible for the death penalty. 
People v. Hampton
, 149 Ill. 2d 71, 90-91 (1992). “[O]nce one such factor is proved, the defendant is eligible for death regardless of whether other factors exist as well.” 
Hampton
, 149 Ill. 2d at 91.

 The only challenge defendant makes to the finding of eligibility based on defendant’s murder of Joshua during an aggravated kidnapping is that the verdict form was defective under this court’s decision in 
People v. Mack
, 167 Ill. 2d 525 (1995), because it omitted certain elements required for eligibility under section 9–1(b)(6). Among the elements for eligibility under the felony-murder statutory aggravating factor are requirements that the “murdered individual *** received physical injuries personally inflicted by the defendant substantially contemporaneously with physical injuries caused by one or more persons for whose conduct the defendant is legally accountable” and that the defendant “acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another.” 720 ILCS 5/9–1(b)(6)(a)(ii), (b)(6)(b) (West 1994).

The felony-murder eligibility verdict form premised on Joshua’s murder provided:

“We, the jury, unanimously find beyond a reasonable doubt that the defendant Jacqueline Annette Williams is eligible for a death sentence under the law. We unanimously find beyond a reasonable doubt that: the defendant was 18 years old or older at the time of the murder of Joshua Evans for which she was convicted in this case; and the following statutory aggravating factor exists: that Joshua Evans was killed in the course of an Aggravated Kidnapping as set forth in paragraph [2] of the second proposition concerning the First Degree Murder of Joshua Evans.”

According to defendant, this verdict form was defective because it omitted the statutory requirements that the defendant actually kill or inflict injuries to the murdered individual and did not require a finding that defendant intended to kill or knew her acts created a strong probability of death or great bodily harm. Defendant contends that there was no “actual verdict” for eligibility under section 9–1(b)(6) because the verdict form did not contain a complete statement of the necessary elements for eligibility under this aggravating factor.

The State responds that defendant cannot raise this issue on appeal because she failed to object to the verdict form, failed to tender an alternative verdict form, and failed to include the issue in her post-trial motion. Alternatively, the State argues that the verdict form was not defective.

We find that defendant has waived this issue for review for the reasons advanced by the State. See 
People v. Redd
, 173 Ill. 2d 1, 41 (1996); 
Enoch
, 122 Ill. 2d at 186. Defendant asserts, however, that the defective verdict form constituted plain error under Rules 451(c) and 615(a). We hold that the challenged verdict form did not omit the required elements for eligibility under section 9–1(b)(6) and, therefore, find no plain error. See generally 
Keene
, 169 Ill. 2d at 17.

In 
People v. Mack
, 167 Ill. 2d 525 (1995), this court reversed the jury’s finding of eligibility because of a defective verdict form. As in the instant case, the defendant’s eligibility in 
Mack
 was based on section 9–1(b)(6). The verdict form at issue in 
Mack
 provided: “We, the jury, unanimously find beyond a reasonable doubt that the following aggravating factor exists in relation to this Murder: Larry Mack killed Joseph Kolar in the course of an Armed Robbery.” See 
Mack
, 167 Ill. 2d at 529-30. The 
Mack
 court found that this verdict form was improper. It explained, “where the verdict purports to set out the elements of the offense as specific findings, it must do so completely or be held insufficient.” 
Mack
, 167 Ill. 2d at 538. The 
Mack
 court concluded that the verdict form at issue was defective because it attempted to set forth a statutory aggravating factor but did so incompletely by omitting the mental state element under section 9–1(b)(6),

In evaluating the effect of this omission, the 
Mack
 court noted that “[t]he test of the sufficiency of a verdict is whether the jury’s intention can by ascertained with reasonable certainty from the language used.” 
Mack
, 167 Ill. 2d at 537. In addition, “all parts of the record will be searched and interpreted together in determining the meaning of a verdict.” 
Mack
, 167 Ill. 2d at 537. The 
Mack
 court rejected, however, the State’s argument that the presence of the mental state requirement in the jury instructions cured any error resulting from the absence of this element from the verdict form. The 
Mack
 court stated that it could not “lightly discount” the possibility that the jury was confused as a result of the discrepancy between the jury instructions and the verdict form. 
Mack
, 167 Ill. 2d at 535. In addition, to conclude that the jury found the existence of the mental state under section 9–1(b)(6), when this element was missing from the verdict form, would be “a speculative attempt to reconstruct the jury’s deliberations and divine its unexpressed conclusions.” 
Mack
, 167 Ill. 2d at 536-37. For these reasons, the 
Mack
 court reversed the eligibility verdict and remanded the cause for resentencing. 
Mack
, 167 Ill. 2d at 538-39; see also, 
e.g.
, 
Buss
, 187 Ill. 2d at 225 (finding the eligibility verdict forms legally insufficient).

We disagree with defendant’s argument that the verdict form relating to her eligibility for the death penalty under section 9–1(b)(6) for Joshua’s murder is invalid under 
Mack
. Instead, we find that the verdict form is like those this court upheld in 
People v. McNeal
, 175 Ill. 2d 335 (1997).

In 
McNeal
, this court rejected a defendant’s 
Mack
 challenge to the six jury verdicts finding him guilty of first degree murder. The defendant had been charged under three different theories of first degree murder for the murder of two victims. The verdict forms described the different theories in parentheticals. For example, one form stated, “ ‘We, the jury, find the defendant, Aldwin McNeal, Guilty of the offense of first degree murder (was committing the offense of robbery) of Corey Gerlach.’ ” 
McNeal
, 175 Ill. 2d at 359. Another stated, “ ‘We, the jury, find the defendant, Aldwin McNeal, Guilty of the offense of first degree murder (intended to kill) of Perry Austin.’ ” 
McNeal
, 175 Ill. 2d at 360. The defendant in 
McNeal
 argued that these verdict forms were invalid under 
Mack
 because they failed to require a finding that the defendant performed the acts that caused the victims’ deaths or a finding that the defendant possessed the mental state when he performed these acts. 
McNeal
, 175 Ill. 2d at 360.

This court found no 
Mack
 violation. It observed that the jury had been properly instructed as to the elements of the different theories of first degree murder. In addition, unlike 
Mack
, there was no discrepancy between the jury instructions and the verdict forms. The parenthetical material referred to theories of first degree murder under which defendant was charged and conformed with the description of these theories in the instructions. 
McNeal
, 175 Ill. 2d at 362. Based on this reasoning, the 
McNeal
 court found that the verdict forms were proper. 
McNeal
, 175 Ill. 2d at 362.

 As in 
McNeal
, the verdict form and the record in this case permit us to conclude with reasonable certainty that the jury found the existence of the elements required for eligibility under section 9–1(b)(6). There is no discrepancy between the jury instructions and the felony-murder verdict forms in defendant’s case. Instead, the felony-murder eligibility verdict form relating to Joshua’s murder contains an express reference to portions of the jury instructions. These instructions contained a complete statement of the necessary elements for eligibility under section 9–1(b)(6). The jury instruction relating to defendant’s eligibility for the death penalty as a result of Joshua Evans’ murder provided in relevant part:

“Before the defendant may be found eligible for a death sentence under the law for the first degree murder of Joshua Evans, the State must prove the following propositions:

First Proposition: That the defendant was 18 years old or older at the time of the commission of the murder of Joshua Evans of which she was found guilty at the trial of this case; and

Second Proposition: That one or more of the following statutory aggravating factors exist

* * *

[2] Joshua Evans was killed in the course of Aggravated Kidnapping and Joshua Evans received physical injuries personally inflicted by the defendant substantially contemporaneously with physical injuries caused by one or more persons for whose conduct the defendant was legally responsible and the physical injuries inflicted by either the defendant or other persons for whose conduct she is legally responsible caused the death of Joshua Evans; and in performing the acts which resulted in physical injuries personally inflicted by the defendant on Joshua Evans substantially contemporaneously with physical injuries caused by one or more persons for whose conduct the defendant was legally responsible, the defendant acted with the intent to kill Joshua Evans or with the knowledge that her acts created a strong probability of death to Joshua Evans.”

By referring to “paragraph [2] of the second proposition concerning the First Degree Murder of Joshua Evans,” the felony- murder eligibility verdict forms in defendant’s case incorporated the necessary elements under section 9–1(b)(6), including the required mental state and defendant’s infliction of injuries on the decedent.

As a result, unlike 
Mack
, a conclusion in defendant’s case that the jury found the necessary elements under section 9–1(b)(6) need not be based on speculation. When we consider the verdict forms in the context of the record in defendant’s case, we can conclude with reasonable certainty that the jury found these elements. Accordingly, we hold that defendant was properly found eligible for the death penalty based on the felony-murder statutory aggravating factor premised on Joshua’s murder.

As a consequence of this holding, we need not decide the merits of defendant’s challenge to the eligibility verdict under section 9–1(b)(6) for Debra’s murder or her challenges to the eligibility verdicts based on section 9–1(b)(3), 9–1(b)(7), or 9–1(b)(8). Defendant was independently eligible for the death penalty on the ground that she murdered Joshua during an aggravated kidnapping. See, 
e.g.
, 
People v. Williams
, 181 Ill. 2d 297, 320-21 (1998); 
People v. Page
, 156 Ill. 2d 258, 268 (1993); 
Hampton
, 149 Ill. 2d at 90; Thus, the jury’s reliance on any other aggravating factors did not affect its finding that defendant was eligible for the death penalty. See 
People v. Coleman
, 129 Ill. 2d 321, 345 (1989).

2. Consideration of Invalid Statutory Aggravating Factors at the Second Stage Sentencing Hearing

Defendant, however, argues that, under 
People v. Brownell
, 79 Ill. 2d 508 (1980), and 
People v. Pasch
, 152 Ill. 2d 133 (1992), the jury’s consideration of invalid aggravating factors at the second stage of sentencing requires that her death sentence be vacated. In 
Brownell
, this court held that the defendant was entitled to a new second stage sentencing hearing because the jury had considered an invalid aggravating factor at that stage. The defendant was convicted of the murder, rape, and aggravated kidnapping of Louise Betts. The circuit court found defendant eligible for the death penalty under the felony-murder and murder of a witness statutory aggravating factors. The circuit court had determined that, because Betts was a witness to defendant’s crimes, her murder satisfied the requirements of the murder of a witness statutory aggravating factor. This court reversed the circuit court’s eligibility finding, holding that the legislature intended the murder of a witness eligibility factor to apply only when the murder victim is a witness in a separate offense. 
Brownell
, 79 Ill. 2d at 525-26. Although the 
Brownell
 court upheld the circuit court’s eligibility finding based on the felony-murder factor, it concluded that a new second stage sentencing hearing was required because the circuit court had weighed an aggravating factor that the 
Brownell
 court “concluded figured erroneously in the court’s sentencing decision.” 
Brownell
, 79 Ill. 2d at 536.

In cases decided after 
Brownell
, this court has held that the jury’s consideration of invalid statutory aggravating factors at the second stage of a capital sentencing hearing is subject to a harmless error analysis. See, 
e.g.
, 
People v. Cole
, 172 Ill. 2d 85, 103 (1996); 
People v. Bounds
, 171 Ill. 2d 1, 69 (1995); see also 
Shaw
, 186 Ill. 2d at 345 (applying a harmless error analysis to the jury’s consideration of evidence of a nonstatutory aggravating factor). For example, in 
Pasch
, this court held that the felony-murder statutory aggravating factor was invalid because the evidence at trial did not support the predicate felony, but the jury’s consideration of this factor at the aggravation-mitigation stage was harmless. In 
Pasch
, defendant was found eligible for the death penalty under the felony-murder, multiple-murder, and murder of a police officer statutory aggravating factors. Aggravated kidnapping was the underlying felony for the felony-murder statutory aggravating factor. This court reversed defendant’s conviction for aggravated kidnapping, finding insufficient evidence of the “secret confinement” element. 
Pasch
, 152 Ill. 2d at 187-88. The court, therefore, held that the felony-murder aggravating factor was invalid.

The 
Pasch
 court rejected, however, defendant’s claim that the jury’s consideration of this invalid factor at the second stage of sentencing required resentencing under 
Brownell
. The 
Pasch
 court explained that, whereas in 
Brownell
 the sentencer had weighed a factor that was “not warranted by the evidence,” in the case before it, the jury “did not rely on anything it should not have during the second phase of the hearing.” 
Pasch
, 152 Ill. 2d at 190. According to the 
Pasch
 court:

“Once it had been determined that defendant was eligible for the death penalty, by virtue of his actions falling within one of the 10 aggravating factors detailed under section 9–1(b) of the Criminal Code of 1961 [citation], the jury could consider 
any
 aggravating factors. It was not limited to those set forth in subsection (b) in determining whether to impose the death penalty. [Citation.] As a result, even though the jury should not have considered defendant’s restraint of [the victim] in terms of its being a felony, it was entirely proper to have considered defendant’s identical conduct as an aggravating factor in determining whether to impose the death penalty.

Therefore, the absence of a conviction for aggravated kidnapping should not have affected the jury’s decision here, since the jury would have been able to consider the same aggravating and mitigating factors that the defendant claims it actually did consider.” (Emphasis in original.) 
Pasch
, 152 Ill. 2d at 190.

The 
Pasch
 court, therefore, held that no new sentencing hearing was required. See also, 
e.g.
, 
Williams
, 181 Ill. 2d at 321-22;
 Cole
, 172 Ill. 2d at 103; 
Bounds
, 171 Ill. 2d at 69;
 Page
, 156 Ill. 2d at 270; 
Pasch
, 152 Ill. 2d at 190;
 Hampton
, 149 Ill. 2d at 92; 
Coleman
, 129 Ill. 2d at 347; but see 
Shaw
, 186 Ill. 2d at 345 (the jury’s consideration of evidence of a nonstatutory aggravating factor required resentencing).

In the case before us, we have held that defendant was properly found eligible for the death penalty on the basis that she murdered Joshua during an aggravated kidnapping. Even assuming, 
arguendo
, the invalidity of the remaining statutory aggravating factors, we find that the jury’s consideration of these factors at the second stage of sentencing does not require resentencing. See 
Williams
, 181 Ill. 2d at 321 (assuming the invalidity of a statutory aggravating factor, finding that the jury’s consideration of this factor did not require resentencing); 
Page
, 156 Ill. 2d at 269 (same); 
Coleman
, 129 Ill. 2d at 345-46 (same).

At the second stage of sentencing, the jury was instructed that it could consider, as aggravation, the factors it had found at eligibility. The State also briefly argued that aggravating factors the jury could weigh included those that the jury had found at eligibility. As in 
Pasch
, however, even if the jury should not have weighed the challenged statutory aggravating factors, it could have properly considered the conduct underlying these allegedly invalid factors. An examination of this underlying conduct, as well as the other evidence presented at the aggravation-mitigation stage, supports the conclusion that the jury’s consideration of the challenged factors, even if improper, was harmless beyond a reasonable doubt.

Aggravating evidence at the second stage hearing included evidence that defendant had planned to take the unborn child of her friend Debra in order to satisfy her and her boyfriend’s desire for a light-skinned baby boy. She attempted to obtain a gun and ascertained when Edwards would be absent from the apartment. After Caffey shot Debra, defendant stood next to Caffey as he ripped Elijah from Debra’s womb. Defendant did nothing to help Debra or Samantha, and concerned herself only with Elijah, the baby she wanted. To conceal these crimes, defendant hid Joshua at her friend’s apartment. Upon learning that Joshua could identify her, defendant swore at him and attempted to poison him by forcing him to drink iodine, a substance that contributed to his death. She participated further in the torture of this terrified little boy, who tried in vain to get help for his little brother who had been left alone in the apartment with his brutally murdered mother and sister. She helped to strangle Joshua, retrieved a knife to stab him, held him while Caffey stabbed him, and eventually left him to die alone in an alley, half-dressed, in November.

Other evidence presented at the aggravation-mitigation stage showed that such violent conduct by defendant was not an isolated incident. She had previously stabbed Caffey, puncturing a lung, and an object fashioned into a shank was found in her jail cell as she awaited trial in this case. Defendant had a criminal history, including possession of stolen property and forgery, and was on probation at the time of the murders in this case.

The evidence in mitigation was that defendant had dropped out of school when she became pregnant in her sophomore year of high school, she was a good mother, she had a below-average IQ, her boyfriends had physically abused her, and she was psychologically vulnerable to predatory males and more susceptible to coercion than the average person. The defense also presented evidence that Ward wanted the baby Debra was carrying, and Ward had admitted responsibility for Debra’s injuries to another inmate.

This mitigating evidence did little to explain or excuse defendant’s involvement in the horrific crimes against the Evans family. She was accountable for Ward’s conduct and, although she may have been abused in the past and was susceptible to coercion, there was no evidence that coercion or physical threats caused her acts on November 16. To the contrary, the evidence indicates that defendant was motivated by her own desire for a baby and acted apart from and contrary to Caffey’s instructions at times.

In light of the overwhelming aggravating evidence supporting the imposition of the death penalty, we find that any error resulting from the jury’s consideration of allegedly invalid statutory aggravating factors was harmless beyond a reasonable doubt.

B. Holiday Basket Application

Defendant also contends that she is entitled to a new second-stage sentencing hearing because the circuit court erred in admitting evidence of the holiday basket application form from her general assistance file. In a pretrial motion
 in limine
, defendant requested that evidence of the form be excluded because it was disclosed in violation of section 11–9 of the Illinois Public Aid Code (305 ILCS 5/11–9 (West 1996)), which prohibits disclosure of public aid documents, except under certain circumstances. The circuit court denied defendant’s motion.

We will not order a new sentencing hearing based on the admission of this form. Admission of the holiday basket application was cumulative in light of other evidence that defendant wanted Debra Evans’ baby and planned to pretend that Elijah was her son. Any error in the admission of the holiday basket application was, therefore, harmless. See 
Jackson
, 182 Ill. 2d at 74-75. Even assuming that the admission of this evidence was improper, therefore, no new sentencing hearing is necessary.

C. Defense Counsel’s Failure to Request a Compulsion Instruction

Defendant further argues that she was denied the effective assistance of counsel at the second stage of her capital sentencing hearing by her attorneys’ failure to have the jury instructed that compulsion is a statutory mitigating factor. The Illinois death penalty statute includes compulsion among the statutory mitigating factors a jury may consider:

“The court shall consider, or shall instruct the jury to consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty. Aggravating factors may include but need not be limited to those factors set forth in subsection (b). Mitigating factors may include but need not be limited to the following:

* * *

(4) the defendant acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm.” 720 ILCS 5/9–1(c) (West 1994).

Although some statutory mitigating factors were included in the jury instructions, compulsion was not one of them. The jury did receive a general instruction that “[w]here there is evidence of a mitigating factor, the fact that such mitigating factor is not a factor specifically listed in these instructions does not preclude your consideration of the evidence.” Defendant contends, however, that a specific instruction regarding compulsion was necessary. According to defendant, such an instruction was warranted by evidence that her boyfriends, including Caffey, had abused her, and evidence that defendant had a dependent personality and attached herself to predatory males who could make her do things she would not normally do on her own.

Under 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), to establish a claim of ineffective assistance of counsel, a defendant must establish (1) that defense “ ‘counsel’s representation fell below an objective standard of reasonableness’ ” and (2) that “ ‘there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.’ ” 
People v. Morgan
, 187 Ill. 2d 500, 529-30 (1999), quoting 
Strickland
, 466 U.S. at 688, 694, 80 L. Ed. 2d at 693, 698, 104 S. Ct. at 2064, 2068. There is a “strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence.” 
Coleman
, 183 Ill. 2d at 397. A defendant’s failure to satisfy either prong of the 
Strickland
 analysis will result in the rejection of his ineffective assistance claim. 
Shaw
, 186 Ill. 2d at 332.

We find that defendant in this case has failed to overcome the presumption that her attorneys’ performance was adequate. A defendant is entitled to have the jury receive instructions on the law that applies to her theory of the case, provided there is evidence in the record to support that theory. 
People v. Gilliam
, 172 Ill. 2d 484, 519 (1996). The evidence in this case did not support an instruction on the statutory mitigating factor of compulsion. Although there was evidence that defendant was psychologically vulnerable to predatory males who could cause her to do things she would not normally do by threatening her, there was no evidence that Caffey or anyone else threatened defendant or that her actions were the result of threats. To the contrary, there was evidence that, against Caffey’s wishes, defendant brought Joshua to the Schaumburg townhouse. Also, whereas there was evidence that Caffey had beaten defendant in 1994, there was no evidence that he had threatened her with any “imminent” “death or great bodily harm,” as required by the compulsion statutory mitigating factor. Given that the evidence did not support an instruction on the statutory mitigating factor of compulsion, defendant was not entitled to one, and we cannot say that defense counsel were deficient for failing to request a compulsion instruction. See
 Alvine
, 173 Ill. 2d at 297. Accordingly, we reject defendant’s ineffective assistance of counsel claim.

IV. Constitutionality of the Death Penalty

 Defendant makes several additional constitutional challenges to the Illinois death penalty statute. This court has, however, previously rejected the arguments that the death penalty statute is unconstitutional because (1) it places a burden of proof on defendants that precludes meaningful consideration of mitigation (see, 
e.g.
, 
Kliner
, 185 Ill. 2d at 177-78; 
People v. Johnson
, 182 Ill. 2d 96, 112 (1998); 
People v. Simpson
, 172 Ill. 2d 117, 152 (1996)); and (2) it allows the jury to weigh the vague aggravating factor “any other reason” a defendant should be sentenced to death (see, 
e.g.
, 
Johnson
, 182 Ill. 2d at 112-13; 
People v. Mulero
, 176 Ill. 2d 444, 481 (1997); 
People v. Hope
, 168 Ill. 2d 1, 48 (1995)). In other cases, this court has also found no merit to the arguments that the death penalty statute is unconstitutional because (1) prosecutors have discretion to decide to seek the death penalty (see, 
e.g.
,
 People v. Fair
, 159 Ill. 2d 51, 96 (1994)); (2) the prosecution need not give a defendant pretrial notice of its intent to seek the death penalty (
People v. Harris
, 182 Ill. 2d 114, 161 (1998)); (3) there is limited comparative proportionality review of death sentences (see, 
e.g.
, 
People v. Cloutier
, 178 Ill. 2d 141, 173-74 (1997); 
People v. Harris
, 164 Ill. 2d 322, 351 (1994)); (4) there is no requirement that the sentencing body make written findings (see, 
e.g.
, 
Cloutier
, 178 Ill. 2d at 173-74); (5) the sentencing body may consider nonstatutory aggravating factors (see, 
e.g.
, 
Buss
, 187 Ill. 2d at 248; 
Johnson
, 182 Ill. 2d at 112-13); (6) there is no requirement for pretrial notice to defendants of evidence of aggravating circumstances (see 
People v. Mahaffey
, 166 Ill. 2d 1, 33 (1995)); (7) the State has no burden of proof (see, 
e.g.
, 
Cloutier
, 178 Ill. 2d at 173-74); (8) the language of the statute may cause the jury to place the burden of proof on the defendant (see, 
e.g.
, 
Kliner
, 185 Ill. 2d at 177-78; 
Harris
, 182 Ill. 2d at 161; 
Johnson
, 182 Ill. 2d at 112); and (9) the jury is precluded from considering the range of sentences that apply if the death penalty is not imposed (see 
People v. Childress
, 158 Ill. 2d 275, 318 (1994)). Defendant offers no persuasive reason for our reconsideration of these holdings. We also decline to find that these aspects of the death penalty statute combine to make it unconstitutional. As this court stated in 
Childress
, “ ‘[i]f all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional.’ ” 
Childress
, 158 Ill. 2d at 318, quoting 
People v. Phillips
, 127 Ill. 2d 499, 542-43 (1989); see also, 
e.g.
, 
People v. Woolley
, 178 Ill. 2d 175, 215 (1997); 
People v. Edgeston
, 157 Ill. 2d 201, 247 (1993).

CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed. We direct the clerk of this court to enter an order setting Wednesday, January 17, 2001, as the date on which the sentence of death, entered by the circuit court of Du Page County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

Affirmed.

CHIEF JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that Williams’ convictions should not be disturbed. In my view, however, her sentence of death cannot be allowed to stand. For the reasons set forth in my partial concurrence and partial dissent in
 People v. Bull
, 185 Ill. 2d 179 (1998), the Illinois death penalty law is void and unenforceable because it violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, §2). Williams’ sentence of death should therefore be vacated, and she should be sentenced to a term of imprisonment. 720 ILCS 5/9–1(j) (West 1994). Because Williams was found guilty of murdering more than one victim, the term of her imprisonment must be natural life. 730 ILCS 5/5–8–1(a)(1)(c)(ii) (West 1994).