2021 IL App (1st) 192052-U

No. 1-19-2052

November 2, 2021

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 10011 |
| | ) | |
| VINCENT PAOPAO, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*: Defendant's convictions for aggravated discharge of a firearm and aggravated unlawful use of a weapon are affirmed, where the evidence was sufficient to show that he possessed a firearm without a valid firearm owner's identification card, and pointed that firearm through the sunroof of a vehicle, shooting in the direction of two witnesses.

¶ 2    Following a bench trial, defendant Vincent Paopao was convicted of two counts of aggravated discharge of a firearm and one count of aggravated unlawful use of a weapon (AUUW). He was sentenced to concurrent terms of nine years' imprisonment for each count of aggravated

discharge of a firearm and a concurrent term of three years for AUUW. On appeal, he argues the State failed to prove him guilty beyond a reasonable doubt of aggravated discharge of a firearm because the evidence was insufficient to show that he was the person who discharged a firearm from a vehicle in which he was a passenger. He also asserts the evidence was insufficient to prove him guilty of AUUW where he was one of multiple passengers in the vehicle and was unconscious when the weapon was found at his seat next to him. We affirm.

¶ 3    Defendant and codefendant Mario Gadberry were charged by indictment with multiple offenses, premised on a June 6, 2017 shooting, during which defendant was alleged to have personally discharged a firearm from a vehicle at Michiel Martines and Ashley Diaz, as well as at Chicago police officers Artur Tomkow and Greg Stranski.[1] Gadberry pleaded guilty to one count of UUW by a felon in exchange for a six-year sentence. The State proceeded to trial against defendant on eight counts of attempt first degree murder (720 ILCS 5/8-4(a) (West 2016); 720 ILCS 5/9-1(a)(1) (West 2016)), eight counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016)), two counts of aggravated assault of a peace officer (720 ILCS 5/12-2(b)(4.1)(i) (West 2016)), and one count of AUUW (720 ILCS 5/24-1.6(a)(1), (3)(A-5); (a)(1), (3)(C) (West 2016)), and nol-prossed the remaining counts.

¶ 4    Defendant was acquitted of all charges except four counts of aggravated discharge of a firearm directed at Martines and Diaz and the AUUW count. We recount the trial evidence necessary to resolve the challenges to defendant's convictions.

---

[1] While the indictment spells Martines's name as "Michael Martinez," Martines testified at trial that his name is spelled "Michiel Martines." Similarly, the first name of Officer Tomkow is spelled "Arthur" in the indictment, but Tomkow testifies his first name is spelled "Artur."

¶ 5    At trial, Martines testified that on June 6, 2017, shortly before midnight, he was driving a Toyota Camry northbound on Central Avenue with his girlfriend Diaz and stopped for a red light at the intersection of Central and Diversey Avenue. Diaz was in the front passenger's seat with the seat leaned back. A dark sedan drove up to the right side of Martines's vehicle and the sedan's driver made eye contact with Martines, who put his head down. Martines saw a passenger in the front seat of the sedan. When the light turned green, the sedan accelerated forward, "cut off" the Camry, and slowed down. The sedan's passenger displayed a firearm through the sunroof and shot in the direction of Martines or "somebody." Martines could see the passenger's arm protruding through the sunroof up to the elbow, and saw the firearm spark three or four times. He testified that he knew "for a fact" that the passenger discharged the firearm because the driver "couldn't have no way *** to do it" while driving.

¶ 6    Martines quickly turned onto a street curb. A nearby police vehicle activated its emergency lights and sirens, and followed the sedan, which turned left on George Street. Martines drove Diaz to her home and learned that the Camry had sustained ballistic damage. He then drove to the Grand and Central police station, reported the incident, showed the police the Camry's ballistic damage, and left the Camry and its keys with the police. Neither Martines nor Diaz were shot that night.

¶ 7    The State entered into evidence photographs of: Martines's vehicle and the gunfire damage to it, as well as of the black sedan next to Martines's vehicle at the intersection. Martines testified that one photograph showed that the Camry had been shot four times, including on the license plate.

¶ 8    On cross-examination, Martines confirmed that the back of the sedan had tinted glass he could not see through. He could see the driver and could tell there was a passenger with dark hair.

The next day, around 5:20 p.m., Martines spoke with Detective Juan Carlos Morales. Martines did not tell the detective that he was drunk that night, but did tell him he thought the passenger stuck a hand through the sunroof and shot at Martines. Due to the tinted windows in the Infiniti, Martines "could not tell for sure" whether the arm belonged to the driver or the passenger. Martines explained that, had he been driving, he would not drive with one hand and shoot with the other. Martines did not see anyone stand up out of the sunroof with their head or body. On re-cross-examination, Martines testified that he told Morales he did not think the firearm was pointed at the Camry because the firearm "was just shooting" in different directions.

¶ 9    Diaz testified that on the night in question she was tired and had her seat laid back. At a red light on the intersection of Central and Diversey, Martines woke her up and said the occupants of the vehicle next to them were "looking at him wrong." Diaz lifted her seat up and saw two occupants in a vehicle with tinted windows to her right. While the traffic light was still red, a hand with a firearm protruded through the sunroof and fired two or three times. She testified that the firearm was pointed "[i]n the air" and not at her. Once the light turned green, the vehicle drove in front of them and Martines turned left.

¶ 10    On cross-examination, Diaz testified that Martines did not drink any alcohol that night. She also testified that she could not see the face of the passenger in the vehicle due to the tinted windows, and the shooting occurred while the vehicle was still "a little bit" to the Camry's side.

¶ 11    Mario Gadberry testified that on the night in question, he drove around in his Infiniti with two "girls" and defendant, whom he identified in court. Gadberry was in the driver's seat, defendant was in the front passenger's seat, and the two girls sat in the back. About one hour prior to the shooting, the group stopped in an alley where defendant gave Gadberry a black .40-caliber

firearm and told him to "[s]tash it." Gadberry placed the firearm under his seat. They then dropped off the "girls."

¶ 12    Just before midnight, Gadbery and defendant drove northbound in the right lane on Central and stopped at a red light with their windows up and the sunroof open. There was another vehicle next to them, but Gadberry did not pay "too much attention" to it. When the light turned green, he sped in front of the other vehicle because he thought it was going to turn, and because the right lane was ending. Defendant "went on" the sunroof and fired a two-toned, tan and black firearm behind them two or three times.

¶ 13    Gadberry saw blue lights behind him, pulled defendant down, and attempted to flee by accelerating and turning left. The police pursued the Infiniti as it made multiple turns. As they drove down an alley, defendant rolled down the front passenger's window, pointed his firearm through the window, and fired two or three times behind them. Gadberry pulled defendant back into the vehicle and heard gunshots from the police. Gadberry fled until the Infiniti ran out of gas and stopped. The police vehicle crashed into the Infiniti, causing the Infiniti to crash into other vehicles. Gadberry exited the Infiniti and was arrested. At the police station, he identified defendant as the shooter.

¶ 14    The State presented photographs of Gadberry's vehicle and its sunroof, the Camry that defendant shot at, the firearm that was under Gadberry's seat, and the firearm defendant used. Gadberry confirmed that he was currently in prison and had been convicted for UUW by a felon as a result of the shooting. In 2008, he was also convicted for conspiracy to distribute a controlled substance.

¶ 15 On cross-examination, Gadberry confirmed that as a result of the shooting, he pleaded guilty to one count of UUW by a felon in exchange for a six-year sentence, and the State dropped other charges against him. He also acknowledged that in his 2008 case, he agreed to testify against his co-conspirators in exchange for a lesser sentence. Gadberry denied that he gave a "dirty look" to Martines and Diaz at the intersection. When he drove in front of the vehicle, he took his foot off the gas to look for a phone he dropped. Gadberry stuck his head and arm through the sunroof when he pulled defendant down from the sunroof.

¶ 16 Officer Tomkow testified that on the night in question, he was driving an unmarked police vehicle northbound on Central with his partner Officer Stranski in the front passenger's seat. They stopped at Central and Diversey behind a white vehicle. An Infiniti with at least two occupants approached the officers on their right side. Tomkow made eye contact with the driver. When the traffic light turned green, the Infiniti sped forward, drove in front of the white vehicle, and "slammed" on the brakes. A dark-haired occupant on the passenger's side "appear[ed]" on the sunroof, and Tomkow saw 6 to 10 "muzzle flash[es]" aimed in Tomkow's direction. The passenger disappeared from the sunroof, and the Infiniti drove away.

¶ 17 Stranski activated the police vehicle's emergency lights and sirens, and Tomkow drove after the Infiniti as it made several turns. During the pursuit, Tomkow heard gunshots from the right. The Infiniti eventually drove onto George and slowed significantly. Tomkow hit the Infiniti with his vehicle. The driver "immediately" exited the Infiniti and was handcuffed. Tomkow did not see anyone other than the driver exit the Infiniti. He saw defendant, whom he identified in court, sitting in the passenger's seat.

¶ 18    On cross-examination, Tomkow testified that he knew the driver of the Infiniti was not the shooter because he made eye contact with the driver. When the passenger emerged from the sunroof, Tomkow could see his head and upper body. Tomkow did not see another person pull the shooter down from the sunroof. The gunshots Tomkow heard on his right side during the pursuit came from Stranski's firearm. Tomkow went to the hospital and was interviewed by a detective. He never told the detective that the passenger stood up and fired through the sunroof, or that the passenger was a man. He further testified that he filled out a Tactical Response Report stating Gadberry, and not defendant, fired shots.

¶ 19    Stranski testified consistently with Tomkow, but added that at the intersection of Central and Diversey, he could see the Infiniti's driver and defendant, but no one in the back seat. Defendant stood up, lifted his full upper body through the sunroof, and fired a tan semiautomatic pistol backwards. As the officers pursued the Infiniti, defendant leaned through the passenger window and pointed a firearm in Stranski's direction. Stranski fired his weapon 14 times through the police vehicle's windshield and struck the Infiniti's rear windshield. After the pursuit, Gadberry exited the Infiniti and ran. Stranski "cleared" the passenger side of the vehicle by looking inside to make sure defendant was no longer a threat. He saw defendant was not moving and went to assist his partner in subduing Gadberry. After Gadberry's arrest, Stranski opened the Infiniti's front passenger's door and saw the tan semiautomatic pistol next to defendant's right thigh between the opened door and the front passenger's seat. The State entered into evidence photographs of the firearm, and the officers' vehicle and Infiniti after the pursuit. Stranski confirmed that he viewed surveillance footage of the pursuit captured from numerous locations, which the State published to the court.

¶ 20    On cross-examination, Stranski testified that defendant fired six to eight shots from the sunroof. Defendant was shot in the back of the head during the pursuit, and Stranski saw defendant bleeding from the head and face when he approached the passenger's seat.

¶ 21    Chicago police sergeant Chris Meilinger testified that he and his partner Officer Shawn Lucas arrived on George where the Infiniti stopped. Inside the Infiniti, he saw a black and tan semiautomatic handgun resting against defendant's right thigh. Meilinger recovered the handgun, found it was loaded, and "ma[de] it safe."

¶ 22    On cross-examination, Meilinger testified that once defendant was removed from the scene, he saw an additional black semiautomatic handgun underneath defendant's seat. He was unable to give any further details about that firearm, however, and did not find a weapon under the driver's seat as he did not search the vehicle.

¶ 23    Chicago police evidence technician Jack Cervenka testified that at about 1 a.m. that night, he and two other evidence technicians went to the scene near Central and Diversey, and recovered and inventoried four cartridge casings and a fired bullet. They proceeded to a second scene at the intersection of North Newland Avenue and George and observed a police vehicle and an Infiniti. Meilinger gave him a loaded Beretta two-toned handgun. They recovered another firearm from under the Infiniti's seats, a green cap from the back of the Infiniti, three fired bullets from the Infiniti, and two expended shells. Nine expended shells and one fired bullet were recovered from the police vehicle.

¶ 24    Chicago police detective Greg Swiderek testified that at about 12:10 a.m. that night, he and Detectives Mark Garcia and Lawrence Olivares went to the 6900 block of George, where they observed the unmarked police vehicle and Infiniti. They then went to a hospital and interviewed

Tomkow and Stranski. Stranski identified the shooter as the individual in the passenger seat. Later that afternoon, Swiderek and Garcia interviewed Gadberry, who, after being advised of his *Miranda* rights, identified defendant as the shooter in the front passenger's seat.

¶ 25    On cross-examination, Swiderek confirmed that during his first interview, Gadberry stated defendant sat back down by himself after firing through the sunroof. During a second interview, Gadberry did not state that he pulled defendant back into the vehicle, or that defendant fired at the officers during the pursuit.

¶ 26    The State entered a stipulation that, if called, an evidence technician would testify that he recovered a fired bullet from the front passenger's side headlight of the Camry. He also photographed evidence of a bullet hole on the Camry's passenger's side hood and possible ballistic damage to the Camry's front middle grill and lower passenger's side molding. The State further entered a stipulation that the bullet recovered from the Camry could not be identified or eliminated as having been fired from the firearms ultimately recovered from the Infiniti.

¶ 27    The parties also stipulated that, if called, an Illinois police forensic expert would testify that the inventoried Beretta handgun Meilinger gave to Cervenka, which was recovered from the Infiniti, had fired a cartridge case recovered from the Infiniti. The handgun had also fired the cartridge cases and bullet fragment recovered near the intersection of Central and Diversey. The forensic expert would testify that the second firearm recovered from the Infiniti was not identified as having fired any ballistic evidence. Additionally, the State entered stipulations that defendant did not possess a valid firearm owner's identification (FOID) card that night.

¶ 28    The defense called Chicago police detective Morales, who testified that on June 7, 2017, at about 5:22 p.m., he interviewed Martines. During the interview, Martines stated that he saw an

arm extend through a sunroof, but did not specify whether the arm belonged to the driver or passenger of the Infiniti. Martines also told Morales he did not see the passenger at all.

¶ 29    The defense entered a number of stipulations, detailing defendant's injuries and treatment after being shot in the head during the pursuit, including that he received two gunshot wounds to the back of the head and suffered an inner cerebral hemorrhage. The defense also entered a stipulation that, if called, Deputy Chief James D. O'Donnell would testify that he responded to the scene and conducted a "walk-through" with Stranski. Stranski told O'Donnell that he observed a man rise up from a sunroof and fire in the direction of the officers, but did not specify whether the shooter was the driver or passenger. The defense also stipulated that, if called, Chantall Morley, an investigator with the Independent Police Review Authority, would testify that she interviewed Gadberry, and he told her that he knew the police were behind him when he stopped at the intersection of Central and Diversey. Gadberry told Morley that defendant fired only one shot out of the passenger window during the pursuit. Additionally, defendant stipulated that the bullet fragment recovered from the police vehicle was fired from Stranski's service weapon.

¶ 30    The trial court found defendant guilty of two counts of aggravated discharge of a firearm as to Martines, two counts of aggravated discharge of a firearm as to Diaz, and one count of aggravated UUW. The court acquitted defendant of all counts of attempt first degree murder, the four counts of aggravated discharge of a firearm at Tomkow and Stranski, and the two aggravated assault counts, which also concerned Tomkow and Stranski.

¶ 31    In announcing its ruling, the court found that, as a co-defendant, Gadberry had a motive to cast defendant in "the most negative light possible," and the testifying police officers had a vested

interest in the case because Stranski had fired at Gadberry and defendant. However, the court found Martines and Diaz to be "completely disinterested," "credible," and "logical" witnesses.

¶ 32    The trial court noted it was undisputed that Gadberry was driving the Infiniti, defendant was in the front passenger seat, gunfire came from the Infiniti while police were nearby, and the police pursued the Infiniti. The court did not believe the police testimony that someone "popped up out of" the sunroof, as it seemed "patently unrealistic to put it that way" and the civilians did not observe this happen. Nor did the court believe Gadberry's testimony that he attempted to pull defendant down. However, the court did believe that Stranski "was in fear of his life" and acted in a manner "he thought was necessary to save his life and his partner."

¶ 33    The court believed the testimony of Martines and Diaz that a hand or arm was seen protruding from the sunroof. The court acknowledged that Martines and Diaz could not say "beyond certainty" that defendant was the shooter. However, the court "believe[d] beyond a reasonable doubt" that the arm sticking out of the sunroof belonged to defendant, given "the way the car was driven" and "the way that the hand came out." The court stated that considering the corroborated testimony of Martines and Diaz, it was clear Gadberry was driving and it did not "make*** sense" that he "was the one sticking his arm and shooting and driving the car in that manner that he did."

¶ 34    Defendant filed a posttrial motion, alleging in relevant part that a judgment of acquittal should be granted because the only witnesses the court found credible, Martines and Diaz, did not identify him as the shooter. Moreover, the witnesses' accounts were contradictory, and they admitted they could not see into the vehicle due to its tinted windows. Defendant also filed a

"supplemental" posttrial motion, alleging *inter alia* the State failed to establish the identity of the shooter beyond a reasonable doubt.

¶ 35 The court denied defendant's posttrial motions. In doing so, the court found that the circumstantial evidence showed defendant was guilty. The court did not find it significant that the accounts of Martines and Diaz "weren't perfectly in lockstep," as the differences did not weigh on their credibility and "it would actually be more telling" if the accounts were "together in lockstep."

¶ 36 At sentencing, the court merged two of the four counts of aggravated discharge of a firearm into the other two counts, one each with respect to Martines and Diaz, and sentenced defendant to concurrent terms of nine years' imprisonment. The court also sentenced defendant to a concurrent term of three years' imprisonment for AUUW.

¶ 37 On appeal, defendant argues that the State failed to prove him guilty beyond a reasonable doubt of aggravated discharge of a firearm because the evidence did not sufficiently show, or support a reasonable inference, that he was the person who discharged the firearm. He also argues that the evidence was not sufficient to prove him guilty beyond a reasonable doubt of AUUW, where he was one of "multiple passengers" in the Infiniti and was unconscious when the weapon was found at his seat.

¶ 38 "The due process clause of the fourteenth amendment to the United States Constitution requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). When reviewing the sufficiency of the evidence at trial, our inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 39 We will not retry the defendant when reviewing a challenge to the sufficiency of the evidence at trial. *People v. Nere*, 2018 IL 122566, ¶ 69. Rather, it is the role of the trier of fact "to determine the credibility of witnesses, to weigh their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence." *People v. Williams*, 193 Ill. 2d 306, 338 (2000). The trier of fact need not "disregard inferences which flow normally from the evidence before it," or "search out all possible explanations consistent with innocence, and raise those explanations to a level of reasonable doubt." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. We "must allow all reasonable inferences from the record in favor of the prosecution" (*People v. Givens*, 237 Ill. 2d 311, 334 (2010)), and will not reverse a conviction unless the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt" (*People v. Bradford*, 2016 IL 118674, ¶ 12).

¶ 40 We first consider defendant's challenge to the sufficiency of the evidence to sustain his aggravated discharge of a firearm convictions. In order to prove defendant guilty of aggravated discharge of a firearm as charged in this case, the State had to prove beyond a reasonable doubt that he knowingly or intentionally discharged a firearm in the direction of Martines and Diaz. 720 ILCS 5/24-1.2(a)(2) (West 2016).

¶ 41 As an initial matter, we note that while defendant characterizes the issue on appeal as one of identification, citing *Neil v. Biggers*, 409 U.S. 188 (1972), he does not actually dispute that he was present in the vehicle from which the firearm was discharged. At trial, the parties did not dispute that Gadberry was driving the Infiniti at the intersection of Central and Diversey, that

defendant was in the front passenger's seat, that a firearm was fired from the Infiniti, and that the Infiniti then fled from police. The parties also did not dispute that following the pursuit, defendant was found in the front passenger's seat of the Infiniti. Defendant essentially disputed at trial, and now disputes on appeal, whether he was the person in the Infiniti who discharged the firearm. He argues that the evidence was not sufficient to show that he, and not Gadberry, fired the weapon that was discharged from the Infiniti. We disagree.

¶ 42     After viewing the evidence in the light most favorable to the State and allowing all reasonable inferences from the record in favor of the prosecution, we find that a reasonable trier of fact could conclude that defendant discharged a firearm in the direction of Martines and Diaz. Both Martines and Diaz testified that while they were at the intersection of Central and Diversey, the Infiniti containing Gadberry and defendant sped in front of them. They also testified that an arm protruded from the sunroof of the Infiniti and discharged a firearm multiple times. Ballistic evidence showed the Camry that Martines and Diaz were inside sustained gunshot damage. Additionally, Martines testified that he knew "for a fact" that the passenger discharged the firearm because the driver "couldn't have no way *** to do it" while driving. The court ultimately agreed with that conclusion, finding it "believe[d] beyond a reasonable doubt" that defendant fired through the sunroof, given "the way the car was driven" and "the way that the hand came out." We will not overturn the circuit court's finding of fact on appeal, as it was the circuit court's role to draw reasonable inferences from the evidence. *Williams*, 193 Ill. 2d at 338.

¶ 43     Moreover, after Gadberry fled from the police, defendant was found in the passenger's seat of the Infiniti with not one but two firearms in his proximity, one rested next to his thigh and one under his seat. The State's stipulated evidence showed that the ballistic evidence recovered from

Central and Diversey was linked to the firearm recovered from defendant's thigh. Despite any minor disparities between the testimony of Martines and Diaz, this evidence and the reasonable inferences therefrom were sufficient to support the conclusion that defendant discharged a firearm in the direction of Martines and Diaz, and thus sustain his conviction for aggravated discharge of a firearm. See *People v. Meyers*, 2018 IL App (1st) 140891, ¶¶ 26-39 (finding the direct and circumstantial evidence was sufficient to sustain the defendant's aggravated discharge of a firearm conviction, despite the apparent "evidentiary disparit[ies]," which were ultimately resolved against the defendant); *People v. Richardson*, 123 Ill. 2d 322, 353 (1988) ("[M]inor inconsistencies in testimony do not, of themselves, create reasonable doubt.").

¶ 44　　Defendant nevertheless argues that his presence in the front passenger's seat of the vehicle did not support a reasonable inference he was the shooter. However, the trial court was not required to disregard the normal inference that flowed from this evidence, *i.e.*, that defendant discharged a firearm at Martines and Diaz through the Infiniti's sunroof as Gadberry drove the Infiniti. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. Nor are we persuaded by defendant's multiple challenges to Martines's credibility based on his "inconsistent" statements to detectives, and his "poor and obstructed vantage point" during the shooting. The trial court expressly determined that Martines was credible and had no motive to present false testimony. It was the role of the trier of fact to make credibility determinations, and we will not retry defendant and overturn that determination on appeal simply because he claims a witness was incredible. *Williams*, 193 Ill. 2d at 338; *People v. Gray*, 2017 IL 120958, ¶ 36 (the testimony of a single witness, if positive and credible, is sufficient to sustain a conviction). Further, contrary to defendant's argument, forensic evidence

such as DNA or fingerprints was not necessary to sustain his conviction. *People v. Fleming*, 2013 IL App (1st) 120386, ¶ 74 (circumstantial evidence is sufficient to sustain a criminal conviction).

¶ 45    In sum, we find the State presented sufficient evidence to establish defendant's guilt of aggravated discharge of a firearm. Stated differently, the evidence presented was not so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt. *Bradford*, 2016 IL 118674, ¶ 12.

¶ 46    The trial evidence was likewise sufficient to establish defendant's guilt of AUUW. To sustain defendant's conviction for AUUW as charged, the State was required to show that he knowingly carried a firearm in a vehicle, the firearm was "uncased, loaded, and immediately accessible at the time of the offense," and defendant did not have a valid license under the Firearm Concealed Carry Act or a valid FOID card. 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5); (a)(1), (a)(3)(C) (West 2016).

¶ 47    As recounted above, the State's evidence established that defendant, while in a vehicle, intentionally discharged a firearm at Central and Diversey in the direction of Martines and Diaz. The parties also stipulated that defendant did not have a valid FOID card during the incident. Naturally, this evidence was sufficient to show that he knowingly possessed a firearm in a vehicle during the shooting at the intersection, even if he was later found unconscious with the firearm next to him. See *People v. Jones*, 2019 IL App (1st) 170478, ¶ 27 ("Actual possession is proved by testimony that the defendant exercised some form of dominion over the firearm, such as that he had it on his person.").

¶ 48    We find the evidence at trial was sufficient to sustain defendant's convictions for aggravated discharge of a firearm and AUUW.

¶ 49     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 50     Affirmed.